Keith A. Kelly (4748)
Steven W. Call (5260)
Steven C. Strong (6340)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, UT 84145-0385
Telephone: 801-532-1500
Facsimile: 801-532-7543

*Attorneys for Petitioning Creditor Aquila, Inc.*

---

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>C. W. MINING COMPANY, a Utah corporation,<br><br>Debtor. | Bankruptcy Case No. 08-20105<br><br>(Involuntary Chapter 11)<br><br>Hon. Judith A. Boulden<br><br>[Filed Electronically] |

---

### MOTION OF AQUILA, INC. FOR ORDER PRESERVING AND PROTECTING ASSETS OF BANKRUPTCY ESTATE AND REQUIRING NOTICE AND HEARING IN CONNECTION WITH DEBTOR'S PURPORTED SALE OF SUBSTANTIALLY ALL OPERATING ASSETS TO A RELATED ENTITY

---

Aquila, Inc. ("Aquila"), one of three petitioning creditors that commenced this

involuntary chapter 11 case against C. W. Mining Company ("CWM" or the "Debtor"), hereby

moves this Court, pursuant to 11 U.S.C. § 303(f) and 11 U.S.C.§ 105(a) for an order preserving

the assets of the bankruptcy estate for the benefit of creditors and for an order that assets of estate

not be sold, transferred, encumbered out of the ordinary course of business until notice is given to all creditors, this Court and other parties in interest of the sale and a hearing is held before this Court.

The Motion is brought because special counsel for the Debtor, Russell Walker, has recently informed Aquila Inc. that the Debtor is in the process of selling all of the Debtor's operating assets to an entity called Hiawatha, which is related to the Debtor.  The consideration, if any, to be paid for the Debtor's operating assets appears to be the future payment of pre-petition claims owing to creditors related to the Debtor.  Debtor's counsel has provided no information concerning how the proposed sale price was determined. The Debtor has also provided no information how Hiawatha can purchase the Debtor's operating assets when the Debtor's long term right to mine coal at the mines is owned by the Debtor.

Based upon the foregoing, Aquila seeks an order from this Court preserving and protecting the Debtor's assets by providing that: (a) the sale, transfer or disposition of substantially all the Debtor's assets be made, completed and/or consummated only after notice has been given to creditors and other parties in interest and a hearing held before this Court; (b) the sale, transfer or disposition of the Debtor's operating assets be made only after the Court has adjudicated Aquila's motion for sanctions against COP Coal which has been filed to preserve the Debtor's mining leases for the Debtor's estate and to impose sanctions against COP Coal for its efforts to terminate those mining leases; (c) that the Court determine whether the terms of sale are fair and reasonable;  (d) if the sale is approved that the value to paid to the  Debtor for its operating assets be deposited into the Court or an appropriate escrow and not disbursed until

further order of this Court; and (e) that the proceeds from the sale be distributed to creditors in accordance with applicable law.

Aquila further requests, pursuant to 11 U.S.C. § 105(d), that the Court schedule a status conference in connection with the expeditious and economical resolution of this case to address various matters including but not limited to the Debtor's efforts to sell, transfer and dispose of all of its operating assets to a related entity without notice to creditors or the Court and to address discovery issues in the case.

This motion is supported by the following memorandum of points and authorities and the memorandum of points and authorities filed with the Court in support of Aquila's motion for sanctions against Standard Industries, Inc. and C.O.P. Coal Development Company.

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF RELEVANT FACTS

1.      On January 8, 2008 (the "Petition Date"), Aquila, along with two other creditors of the Debtor, House of Pumps, Inc. ("House") and Owell Precast, L.L.C. ("Owell"), commenced this bankruptcy case by filing an involuntary petition for relief against CWM under chapter 11 of the Bankruptcy Code.

2.      Pursuant to this Court's Order Governing Scheduling and Setting Trial Date (docket # 37), as modified by the Order Approving Stipulation to Amend Scheduling Order (docket # 61), Aquila has been actively seeking discovery in preparation for the trial on the involuntary petition, which is set to begin on October 6, 2008. However, most of the entities related to the Debtor have refused to produce documents or appear for their deposition examinations pursuant to the subpoenas served upon them.

3

3.      After the Petition Date, Aquila learned that two entities which appear to be closely related to the Debtor, namely Standard Industries, Inc. ("Standard") and C.O.P. Coal Development Company ("COP Coal") have been violating the automatic stay.

4.      Aquila asserts that COP Coal has been willfully violating the automatic stay through its repeated efforts to terminate the Debtor's rights in certain mining leases so that COP Coal could lease the mine to a separate but related entity.

5.      Aquila asserts that Standard has been willfully violating the automatic stay through its efforts to collect on unpaid accounts for coal sold by the Debtor pre-petition by collecting or attempting to collect those accounts for its own benefit.

6.      In order to bring these stay violations to the attention of the Court, on June 25, 2008 Aquila filed a Motion for Order of Civil Contempt Against Standard Industries, Inc. and C.O.P. Coal Development Company for Violations of the Automatic Stay (the "Contempt Motion") (docket # 65) and a Memorandum in Support of Contempt Motion (the "Contempt Memorandum") (docket # 66). The Contempt Memorandum explains the close relationship between the Debtor, Standard, and COP Coal as entities that are ultimately controlled and/or operated by the Kingston polygamy clan and the Davis County Cooperative Society. *See* Contempt Memorandum (Statement of Facts ¶¶ 5-7).

7.      The Contempt Memorandum explains that the Debtor operates a coal mine near Huntington, Utah, under a 25-year Operating Agreement with COP Coal, and that in violation of the stay, COP Coal has been aggressively attempting to collect pre-petition obligations allegedly owing by the Debtor under the Operating Agreement and has even threatened to unilaterally

terminate the Operating Agreement and remove the Debtor from possession of the coal mine.
*See* Contempt Memorandum (Statement of Facts ¶¶ 36-54).

8.      Because the Operating Agreement is a long-term agreement allowing the Debtor
to mine coal for many years and because the price of coal has increased dramatically in recent
months, the mining leases are the Debtor's most valuable asset.  Thus, the Debtor's rights as of
the Petition Date to mine coal under the Operating Agreement clearly are protected by the
automatic stay.

9.      The hearing on Aquila's Contempt Motion against Standard and COP Coal has
been set for August 1, 2008.

10.      Notwithstanding the filing and service of the Contempt Motion on June 25, 2008,
two days later on Friday, June 27, 2008, Aquila received a letter from the Debtor's special
counsel, Russell Walker, stating that the Debtor had recently closed, or was about to close, on an
alleged sale "of substantially all of" the Debtor's assets to Hiawatha Coal Company, Inc.
("Hiawatha").

11.      A copy of the June 27, 2008 letter (the "Walker Letter") is attached hereto as
Exhibit A and copies of the "Closing Statement," the "Purchase and Sale Agreement," and the
"Bill of Sale" (without exhibits) that accompanied the Letter are attached hereto as Exhibit B.

12.      The records of the Utah Department of Commerce evidence that the address of
Hiawatha is 3212 South State Street in Salt Lake City and that this is the same address as COP
Coal.  These records also show that Hiawatha's registered agent is Carl E. Kingston who is also
the registered agent for the Debtor and the registered agent for COP Coal. *See* Exhibit C.  Carl
E. Kingston also served as trial counsel for the Debtor in the litigation with Aquila before Judge

Tena Campbell which resulted in large money judgment against the Debtor in favor of Aquila.
Aquila requests that the Court take judicial notice of these public records.

13.    In addition, according to the "Coal Operators List" maintained by the Division of
Oil, Gas & Mining of the Utah Department of Natural Resources, the Debtor and Hiawatha have
the same mailing address at P.O. Box 1245, Huntington, Utah  84528, the same telephone
number, 435-687-2450, and a common employee, Mark Reynolds. *See* Exhibit D.  The Coal
Operators List, referred to is available to the public on the Utah State's website at:
*http://dogm.nr.state.ut.us/coal/CoalOperators.pdf* and the Court is requested to take judicial
notice of these records.

14.    Based upon the foregoing records, it appears certain that Hiawatha is yet another
company related to the Debtor that is under the control of the Kingston clan and the Davis
County Cooperative Society.

15.    The Walker Letter states that one of the primary reasons for the sale of the
Debtor's operating assets is the Debtor's "inability to fund the workout of Operating Agreement"
with COP Coal – indicating that this new sale of substantially all of the Debtor's assets is
purportedly necessary because of the aggressive efforts by COP Coal to collect pre-petition
debts.  Aquila has asserted that COP Coal's collection efforts to terminate the Debtor's long term
mining rights to have been willfully made in violation of the automatic stay as detailed in
Aquila's Contempt Memorandum.

16.    Although the Walker Letter states that the sale to Hiawatha is a "sale of
essentially all" of the Debtor's assets, the Purchase and Sale Agreement between the Debtor and
Hiawatha conspicuously fails to address the Debtor's right to mine the coals reserves under the

Operating Agreement made between the Debtor and COP Coal and how Hiawatha will be able

mine coal reserves which have been leased to the Debtor.

17.    The failure to account for the Debtor's long term mining rights under the

Operating Agreement is likely due to the position taken by COP Coal that the Debtor's long term

mining rights under the Operating Agreement were terminated post-petition by COP Coal

without Court approval or relief from the automatic stay. *See* Contempt Memorandum,

Argument at pp. 4-6.

18.    Although documents subpoenaed from COP Coal by Aquila indicate that the

Operating Agreement was not terminated before the Petition Date, *see id.,* the Debtor is

apparently unwilling to take any action to preserve its long term mining rights under the

Operating Agreement because the persons controlling the Debtor desire to have the Debtor's

mining leases under the Operating Agreement assigned to a new Kingston-related entity,

Hiawatha, which apparently does not have any large claims against it.

19.    According to the Purchase and Sale Agreement and related documents (*see*

Exhibit B), Hiawatha will pay $14,075,007.69 in exchange for the Debtor's operating assets.

However, the sale documents reflect that most of the purchase price is simply the assumption of

alleged pre-existing debts owing by the Debtor to Kingston related entities.  Thus, the purported

sale will in essence result in the preferential distribution of assets to Kingston related entities to

the detriment of all other creditors, including Aquila.

20.    Under Section 3 of the Purchase and Sale Agreement, it appears that Hiawatha

has 30 days after the closing of the purported sale transaction to pay a substantial amount of the

consideration to the Debtor.

21.     Aquila asserts that a gross injustice will occur if the Debtor is permitted to

transfer substantially all of its operating assets, without notice or hearing, to a related entity by

assuming pre-petition debts owing to related entities while Aquila and other creditors are stayed

from pursuing the Debtor's assets as a result of the automatic stay.  For these reasons, Aquila is

moving the Court to protect and preserve the Debtor's assets.

## ARGUMENT

I.     **THE COURT SHOULD MAKE AN ENTER AN ORDER PRESERVING AND
PROTECTING PROPERTY OF THE BANKRUPTCY ESTATE.**

A.     **The Assets Transferred or to Be Transferred by the Debtor to Hiawatha Are
Property of the Debtor's Estate Pursuant to 11 U.S.C. § 541(a).**

The assets transferred or to be transferred by the Debtor to Hiawatha are property of the

bankruptcy estate pursuant to 11 U.S.C. § 541(a) which provides, in part, as follows:

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an
> estate.  Such estate is comprised of all the following property, wherever located and by
> whomever held:
>
>> (1) Except as provided in subsections (b) and (c)(2) of this section, **all legal or
>> equitable interest of the debtor in property as of the commencement of the
>> case.**
>>
>> . . .
>>
>> (6) Proceeds, product, offspring, rents, or profits of or from property of the estate,
>> except such as are earnings from services performed by an individual debtor after
>> the commencement of the case.

11 U.S.C. § 541(a)(emphasis added).  Based upon the foregoing section, all of the assets the

Debtor is purporting to transfer to Hiawatha are property of the Debtor's bankruptcy estate as a

matter of law.

**B.**     **Notice of the Proposed Sale Should Be Given to Creditors and Parties in Interest.**

Bankruptcy Rules 6004 and 2002 provide that prior notice of a proposed use, sale or lease

of property *outside of the ordinary course of business* must be given to all creditors.  Rule

6004(a) provides as follows:

> (a) NOTICE OF PROPOSED USE, SALE, OR LEASE OF PROPERTY.  Notice of a
> proposed use, sale or lease of property, other than cash collateral, <u>not in the ordinary
> course of business</u> shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if
> applicable, in accordance with § 363(b)(2) of the Code.

Fed. R. Bankr. P. 6004(a) (emphasis added).  Rule 2002(a) provides that except as provided in

subdivisions (h) (filed claims), (i) (committees), (l) (publication), (p) (foreign creditors) and (q)

(notice of proceedings), "the clerk, or some other person as the court may direct, shall give the

debtor, the trustee, **all creditors** and indenture trustees **at least 20 days' notice by mail of**: . . .

(2) a proposed use, sale, or lease of property of the estate other than in the ordinary course of

business, unless the court for cause shown shortens the time or directs another method of giving

notice; " Fed. R. Bankr. P. 6004(a)(2).

The sale documents (Exhibit B) reflect that the Debtor is purporting to sell substantially

all of its operating assets outside of the ordinary course of business without giving notice to

creditors, the Court or other parties in interest.  Therefore, the Court should order that proper

advanced notice of the proposed sale outside of the ordinary course of business to a related entity

be given to all creditors, the Court and other parties in interest in accordance with governing

rules.

C.    <u>The Court Has Authority to Protect and Preserve Assets of the Bankruptcy
Estate for the Benefit of Creditors.</u>

The Bankruptcy Court has the power to preserve and protect the assets of the bankruptcy

estate for the benefit of creditors in all cases, including involuntary cases.  However, after an

involuntary petition has been filed but before the entry of an order for relief, the Debtor is

generally permitted to continue in the operation of its business and may use, acquire, or dispose

of property subject to the Court's power to order otherwise.  Section 303(f) provides:

> Notwithstanding section 363 of this title, *except to the extent that the court orders
> otherwise*, and until an order for relief in the case, any business of the debtor may
> continue to operate, and the debtor may continue to use, acquire, or dispose of property as
> if an involuntary case concerning the debtor had not been commenced.

11 U.S.C. § 303(f)(emphasis added).  Therefore, pursuant to the foregoing section, "the court

may prevent a debtor from controlling an asset during the 'gap period' between the filing of the

involuntary petition and the entry of an order for relief."  *Jenkins v. Hodes (In re Hodes)*, 402

F.3d 1005, 1009 (10th Cir. 2005).[1]

Here, an involuntary petition for relief was filed under Chapter 11 by Aquila, House and

Owell because the Debtor was not paying its debts as they became due.  Indeed, at the time the

petition was filed on January 8, 2008, COP Coal had issued a notice of default seeking to

---

[1] Where the involuntary petition for relief is one for liquidation under chapter 7, section 303(g)
provides that the Bankruptcy Court, after notice and hearing, can appoint an interim trustee "to
preserve the property of the estate or to present loss to the estate" and the debtor can recover
possession of the property only the debtor files a bond as conditioned by the Court.  *See* 11
U.S.C. § 303(g).  In this case the involuntary petition filed against the Debtor was one under
chapter 11 so that the Debtor could reorganize it financial affairs; however, the purported sale of
substantially all of the Debtor's assets reflects that the Debtor is not planning to reorganize it
business but to liquidate its assets.  As such, the Court should also order such further legal or
relief that is necessary protect the assets of the estate from diminution and loss resulting from the
transfer of the Debtor's assets to a related entity.

terminate the Debtor's mining leases on grounds that more than $3,000,000 in alleged unpaid royalties were due and owing, and the U.S. District Court had entered a money judgment against the debtor in favor of Aquila in excess of $24 million on October 30, 2007 which remained unpaid.

At a scheduling conference held before this Court early in this case, Aquila's counsel indicated that Aquila was prepared to file summary judgment on the involuntary petition filed against the Debtor and that Aquila could be prepared, if necessary, for an evidentiary hearing in thirty days. At the Debtor's request, however, the Court scheduled a hearing on the involuntary petition at a much later date in October 2008. Now, before the evidentiary hearing on the involuntary petition has been heard, the Debtor is seeking to sell and transfer all of its operating assets to Hiawatha (a related entity) without notice to creditors, the Court or other parties in interest. As such, this Court should make and enter an order protecting and preserving, for the benefit of creditors, the Debtor's assets and any proceeds to be received from the sale of such assets.

### D.    The Court has Equitable Powers to Protect the Debtor's Assets from a Purported Fraudulent or Preferential Transfer During the Gap Period.

Section 11 U.S.C. § 105(a) of the Bankruptcy Court empowers Bankruptcy Courts to prevent injustice to creditors in a bankruptcy case. The section provides as follows:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to present an abuse of process.

11 U.S.C. § 105(a).  A fundamental purpose of an involuntary case is to protect and preserve the

Debtor's assets so that those assets may be administered fairly.  If liquidation is necessary, the

assets should be liquidated only after notice is given to creditors and other parties in interest.

Upon liquidation, the proceeds from the sale of a debtor's assets are distributed in compliance

with law.  Here, because a $24 million judgment was entered against the Debtor in favor of

Aquila, the Debtor is seeking to transfer all of its operating assets to related entity without giving

notice to all creditors and other parties in interest (who are stayed from taking action against the

Debtor or its assets pursuant to 11 U.S.C. § 362).  The proceeds of the purported sale are not

being distributed in compliance with law but are being paid primarily to creditors related to the

Debtor.  The Debtor's purported sale of operating assets fails to address the Debtor's long-term

right to mine coal under the Operating Agreement and how the sale will impact that right.  As

such, the Court should invoke its equitable power to preserve and protect all of the assets of the

bankruptcy estate for the benefit of all creditors pending notice to all creditors and a hearing

before the Court.

## CONCLUSION

The Debtor has demonstrated thus far in this case that it wants nothing more than to

transfer its assets entirely out of the reach of its legitimate creditors and into the hands of related

entities.  The facts set forth above and in Aquila's Contempt Memorandum establish that the

Debtor has not enforced the automatic stay against Standard or COP Coal, which are entities

related to the Debtor.  In addition, the collusive sale documents prepared between the Debtor and

Hiawatha establish that the Debtor is attempting to transfer substantially all of its operating

assets outside of the ordinary course of business to a related entity without notice to creditors or

Bankruptcy Court approval.  The purported sale documents also establish that the Debtor's long-term right to mine coal under the Operating Agreement has not been addressed and that the Debtor is pretending that the Debtor's long-term right to mine coal was somehow terminated post-petition by COP Coal.  In sum, the Debtor cannot be trusted to fulfill its statutory and fiduciary duties of protecting assets of the estate for the benefit and creditors and other parties in interest and the Court should enter an order protecting and preserving the assets of the bankruptcy estate.

## RELIEF REQUESTED

WHEREFORE, for the foregoing reasons Aquila respectfully requests the Court to make and enter an order:

(1)  Prohibiting the Debtor from using, transferring, encumbering or disposing of any its assets outside the ordinary course of business without first obtaining approval from this Court after notice and a hearing;

(2) Commanding the Debtor to give notice to all creditors and parties in interest of the Debtor's efforts to sell and transfer all of its assets to a related entity based upon the purported assumption of indebtedness owing to alleged creditors which are related to the Debtor;

(3) Prohibiting the Debtor, without Court approval, from taking any action whatsoever to transfer, terminate, assign, impair or encumber the Debtor's long-term right to mine coal under the Operating Agreement made between the Debtor with COP Coal;

(4) Providing that, in the event the Court approves the sale and transfer of the Debtor's assets after notice and hearing, the proposed buyer Hiawatha shall pay into the registry of this

Court or to an appropriate escrow account all consideration paid for the purchase of the Debtor's assets and that those proceeds shall be distributed to creditors pursuant to this Court's order; and

(5) Providing for such further legal, equitable and/or sua sponte relief as the Court deems just and appropriate, including but not limited to the entry of an immediate order for relief pursuant to 11 U.S.C. § 303 and the appointment of an interim trustee.

Respectfully submitted this 7th day of July, 2008.

RAY QUINNEY & NEBEKER P.C.

/s/ Steven C. Strong
Keith A. Kelly
Steven W. Call
Steven C. Strong
*Attorneys for Aquila, Inc.*

990444v5

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing *Motion of Aquila, Inc. for Order  Preserving And Protecting Assets Of Bankruptcy Estate And Requiring Notice And Hearing In Connection With Debtor's Purported Sale Of Substantially All Operating Assets To A Related Entity* was electronically filed on July 7, 2008 and therefore electronic notification of the Motion was served on the following parties:

- David E. Leta;   dleta@swlaw.com, wsmart@swlaw.com,;kgoley@swlaw.com
- Joel T. Marker; joel@mbt-law.com
- John T. Morgan tr;  john.t.morgan@usdoj.gov, james.gee@usdoj.gov
- Oliver K. Myers;  myersok@msn.com
- Paul James Toscano; ptoscano@expresslaw.com, eallred@expresslaw.com;bgonzales@expresslaw.com;ptpcecf@gmail.com
- United States Trustee;  USTPRegion19.SK.ECF@usdoj.gov
- Russell S. Walker; rwalker@wklawpc.com, ckirk@wklawpc.com

I further certify that on July 7, 2008 copies of the foregoing Motion were served via first-class mail, postage prepaid, upon the following parties:

Conrad H. Johansen
Olsen Skoubye & Nielson
999 East Murray-Holladay Road, Suite 200
Salt Lake City, UT 84117

Mark Hansen
Attorney for Standard Industries
431 North 1300 West
Salt Lake City, UT  84116

Carl E. Kingston
Attorney for C.O.P. Coal Development Company
3212 South State Street
Salt Lake City, UT  84115

John Deere Construction & Forestry Company
P.O. Box 6600
Johnston, IA  50131-6600

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 21126
Philadelphia, PA  19114-0326

                                        /s/ Steven C. Strong

# EXHIBIT A

# WOODBURY & KESLER

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

**RUSSELL S. WALKER**
\*\*\*\*\*\*
LICENSED IN UTAH

June 27, 2008

*Via e-mail and U.S. Mail*
Keith Kelly
Ray Quinney & Nebeker
P.O. Box 45385
Salt Lake City, Utah 84145

> Re: *In re: CW Mining*, Bankruptcy No. 08-20105

Dear Keith:

Please find attached to this e-mail a copy of a Purchase and Sale Agreement between C.W. Mining Company ("CW Mining") and Hiawatha Coal Company, Inc. ("Hiawatha"). This sale of essentially all of CW Mining's assets to Hiawatha is primarily due to CW Mining's inability to fund the workout of Operating Agreement with C.O.P. Development Company ("COP") and to meet its ongoing payroll and operating obligations.

As I explained to you on several occasions, Aquila's failure to respond to CW Mining's global settlement offer and failure to come to an agreement on the Utah American Energy garnishment prevented CW Mining from obtaining the necessary funds to pay COP and workout a new operating agreement with COP and to pay operating and payroll expenses. These failures were critical factors in the decision to sell the assets.

We believe this sale is in the best interests of the majority of creditors including the employees, secured creditors, vendors and the only viable solution with COP.

If you would like to discuss this matter in more detail, please call me at 364-1100.

Very truly yours,

**WOODBURY & KESLER, P.C.**

*Russell S. Walker*

Russell S. Walker
Attorney at Law

RSW:ck
Enc.
cc: CW Mining Company, Inc. w/o attachment
    Carl Kingston E. Kingston w/o attachment
    Paul J. Toscano w/o attachment

# EXHIBIT B

CLOSING STATEMENT

C. W. Mining Company, Seller          Hiawatha Coal Company, Inc., Buyer

Property:  Assets from underground coal mining operation in Bear Canyon, Emery County, Utah

| | Seller | Buyer |
|---|---|---|
| Sales Price | ~~$13,860,634.00~~ | |
| | 14,075,007.69 *E. F. F.* | |
| Amounts assumed at closing: | | |
| Reclamation Bond Liability | | $2,211,089.00 |
| Balance due Bank of Utah | | 1,832,749,89 |
| Balance assumed World Enterprises | | 5,097,369.76 |
| Balance assumed Security Funding | | 984,226.34 |
| Balance assumed ABM | | 1,699,573.70 |
| | | 11,825,007.69 |
| Amounts to be paid directly to creditors/employees, or | | |
| Additional amounts payable to World | | |
| Enterprises on or before thirty days after closing | | 2,250,000.00 |
| Total amount paid or assumed by Buyer | | $14,075,007.69 |

Tax pro-ration:  Buyer responsible for
           any sales or other tax liability
           resulting from sale and transfer

The undersigned hereby accept the above information as true and correct and hereby hold Carl E. Kingston harmless and free of any liability resulting from different information or amounts described herein which is later deemed incorrect.

Dated ___June 24th___, 2008.

C. W. Mining Company, Seller

By _____

Hiawatha Coal Company, Inc., Buyer

Dated ___6 - 24___, 2008.

By _____

PURCHASE AND SALE AGREEMENT

THIS AGREEMENT, made and entered into this 24th day of June, 2008, by and between C. W. Mining Company, a Utah corporation doing business as Co-op Mining Company whose address is P. O. Box 65809, Salt Lake City, Utah 84165, hereinafter called "Seller", and Hiawatha Coal Company. Inc., a Utah corporation whose address is ~~P. O. Box 1201, Hiawatha~~, Utah 84528, hereinafter called "Buyer", WITNESSETH:

*P.O. Box 1202 Huntington E.J. ✓ ce.*

WHEREAS, Seller now owns and operates an underground coal mining business located in Bear Canyon, Emery County, Utah , and

WHEREAS, Seller desires to sell to Buyer and Buyer desires to purchase from Seller, certain assets of Seller's business,

NOW, THEREFORE, in consideration of the mutual promises hereinafter contained, it is agreed by and between the parties as follows:

Section 1. Purchase and Sale of Assets.    Seller hereby agrees to sell, convey, transfer, assign and deliver to Buyer, at closing, against payment by Buyer of the purchase price (as hereinafter defined), the following property:

§1.01  Parts, Supplies and other inventory.  All of Seller's parts, supplies and inventory of equipment and supplies held by Seller for use in the ordinary course of its business as of the closing date.  Buyer shall not purchase any hazardous material or any dangerous or illegal material.  The parties shall cause a physical inventory to be taken of Seller's inventory by the closing date, which will be attached hereto as Exhibit "A".  The parties agree that the value of the parts, supplies and other inventory shall be the fair market value, as determined by an independent appraiser.

§1.02  Proprietary Information, Permits, Good Will, Improvements and Intangibles.  All proprietary information permits and intangibles, including but not limited to trade marks, trade names, copyrights, and othr intellectual property, water rights and agreements, rights of way, permits, customer lists, sales and accounts receivable histories, vendors and suppliers lists, any special agreements between Seller and customers and/or suppliers, the business name "Co-op Mining Company" and business good will. All assets described in this paragraph shall be

1

*E.J. cl.*

purchased at an agreed value of $2,250,000.00. The transfer of assets listed in
this paragraph shall include but not be limited to the permits listed on Exhibit "B"
attached hereto and will be subject to any required approvals of third parties.
Seller agrees to maintain all permits and continue as operator and permitee, until
such time as Buyer obtains any and all required approvals.

§1.03  Telephone Number, e-mail Address and Web Pages.  All rights to
and the exclusive use of Seller's telephone number,_____; e-mail address, "____
_____" and all of Seller's web pages used in connection with Seller's
business,_____.
The purchase price of these rights shall be included in the purchase price listed in
§1.02 above.

§1.04  Fixed Assets, rolling stock, fixtures, leasehold improvements,
mining claims, mineral leases, etc.  All fixed business assets, rolling stock,
fixtures, leasehold improvements, mining claims, mineral leases, etc. currently
owned by Seller, including items that have been fully depreciated.  Such assets
are listed on Exhibit "C" attached hereto. The price of such assets shall be the fair
market value, as determined by an independent appraiser, as of the date of
closing, plus $250,000.00.

§1.05  Reclamation Bonds and Workers' Compensation Insurance.  Buyer
and Seller agree that Buyer shall have the right but not the obligation to acquire
the reclamation bonds, including any marketable security or asset used by Seller
as security, to the fullest extent permitted by law and subject to the consent of any
third parties whose consent is required.  Seller agrees to maintain the reclamation
bonds and its workers compensation insurance, in order for Buyer to complete the
assumption or replacement of Seller's bonds and insurance. Seller agrees to
cooperate with Buyer to accomplish the transfer of the reclamation bonds and
security to Buyer, if Buyer so chooses. Buyer shall also have the right to provide
its own reclamation bonds.  Buyer will provide its own workers' compensation
insurance on or before December 31, 2008.  Buyer and Seller agree that any assets
transferred or sold pursuant to this paragraph shall be sold at the fair market value
of the asset transferred.  Securities and bonds transferred under this paragraph are
listed on Exhibit "D".

§1.06.  Prepaid Assets.  Buyer may, but shall not be required to purchase
the prepaid assets owned by Seller, as listed on Exhibit "E" attached hereto.  Any

(435) 687-2450
(435) 687-5238
(435) 687-5777
(435) 687-5724
all email address with
cumming.com domain,
cumming @etv.net,
cumming.com website.

Cl.  E.Z.

2

E.Z.

Cl.

prepaid assets acquired by Buyer shall be acquired at the fair market value of the acquired asset.

§1.07  Personal Property. All personal property remaining on the premises at Bear Canyon, Emery County, Utah, thirty days after closing, whether specifically listed in this Agreement or not, excluding any hazardous or illegal materials, shall become the property of Buyer, unless otherwise agreed in writing.

Section 2. Purchase Price.   The purchase price shall be the aggregate of amounts set forth or determined in accordance with the provisions of §§ 1.01, 1.02, 1.04, 1.05 and 1.06 above.

Section 3.  Payment of Purchase Price.  The full purchase price, except for the amount due in accordance with §1.02 above, shall be payable at closing, in cash or by the assumption of indebtedness to secured creditors, as determined in accordance with §§ 1.01, 1.04, 1.05 and 1.06 above. Buyer shall have up to thirty (30) days to pay the amount due under §1.02 above.  Buyer, in its sole discretion, may pay any amounts due under §1.02, directly to Seller's trade creditors and/or employees.  Any amounts not so paid to Seller's trade creditors or employees under §1.02 within thirty days after closing shall be paid to Seller, by Buyer assuming an amount equal to any amounts remaining under §1.02 of amounts owed to World Enterprises.

§3.01  Payment to Creditors/employees.  The parties acknowledge that Buyer will be doing business with many of the same creditors of Seller and may employ some former employees of Seller.  The parties further acknowledge that Seller's failure to pay some creditors and employees may severely hamper Buyer's ability to do business with such creditors.  Therefore, the parties agree that Buyer may, but shall not be required to, pay directly to Seller's creditors and/or employees, any amounts due to Seller under §1.02, that were due to creditors and/or employees as of the Closing Date.  Nothing in this paragraph shall preclude Seller from negotiating with Seller's creditors to reduce the amount owed by Seller to Seller's creditors.

§3.02  Transfer Taxes.  In addition to the purchase price payable by Buyer to Seller, Buyer agrees to pay  all sales, use and transfer taxes and all costs of filing and recording fees incident to the transfer of property and assets hereunder.

Section 4.  Seller Retains Accounts Receivable and Payable, etc.  Buyer will not purchase any accounts receivable, cash, CD's, checking, savings and other money accounts and notes receivables, capital stock, corporate books and records, stock or equity interest owned by Seller in other entities, financial, tax, accounting, personnel and business records of Seller existing prior to the closing date.  Buyer will not purchase any

3

performance bonds and cash or other collateral/security for same, payments or prepayments on bonds, deposits in escrow accounts, other prepaid items, deposits, retainers, insurance policies and any rights or claims arising from such policies owned by Seller, except those specifically listed in §1.05. Buyer will not assume any account payable or other liability of Seller, except as specifically provided for and in the amounts set forth in this Agreement. Buyer shall maintain a complete and accurate record of all receipts, including those on receivables accruing before the closing date. Checks received by Buyer, made payable to Seller, for receivables accruing prior to closing, shall be given to Seller as received. Any other receipts collected by Buyer belonging to Seller, shall be transmitted to Seller monthly. Nothing herein shall preclude Seller from collecting any receivable generated by Seller prior to the closing date, directly from the party from whom payment is due.

Section 5.  Warranties of Seller.   Subject to any necessary approvals of the secured creditors listed in Exhibit "F", third parties who have an interest or control over a particular asset, or any other required approval, Seller warrants that it will be at the time of closing, the sole owner of the assets being transferred hereunder and that as of the closing, such assets will be transferred **AS IS, WHERE IS**, without any warranty as to its condition, merchantability, fitness for a particular purpose, subject only to the indebtedness specifically assumed by Buyer and will be free and clear of all other liens and/or encumbrances except those expressly listed on Exhibit "F" attached hereto and made a part hereof. Subject to all necessary approvals, Seller further warrants that it has the necessary power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and that any necessary corporate actions have been taken to execute, deliver and consummate this Agreement. Seller specifically disclaims any warranty or representation regarding the finances and operations of the business of Seller as a going concern, as this sale is of assets only. Buyer acknowledges that it has conducted its own due diligence and has inspected all of the assets being sold hereunder.

Section 6.  Warranties of Buyer.  Buyer warrants that it has made satisfactory arrangements to fund its obligations hereunder and to consummate the transactions contemplated herein. Buyer further warrants that it has the necessary power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and that all necessary corporate actions have been taken to execute, deliver and consummate this Agreement.

Section 7.  Required Approvals for Closing.  Buyer and Seller both agree that the requirement to close the purchase outlined in this Agreement is subject to the approval of each of the secured creditors listed on Exhibit "F" attached hereto and of third parties

4

*E. 7.*

who have an interest or control over a particular asset. In addition, the parties acknowledge that Seller's obligations hereunder are subject to any necessary approvals. If it is determined that the assignment or transfer of any asset scheduled to be sold or assigned to Buyer hereunder without the approval of an interested third party would trigger a breach, default or forfeiture, or otherwise negatively affect the rights of Seller or Buyer, and the approval of such third party cannot be obtained, then such asset(s) shall be excepted from this sale and the purchase price payable to Buyer from Seller will be adjusted to reflect the exception of the asset(s). The parties agree to cooperate in obtaining any needed approvals from interested third parties, both before and after closing.

Section 8.  Security for Buyer's Obligations.  Buyer acknowledges that the assets purchased hereunder, including those assets referred to in §§1.01, 1.02, 1.03, 1.04, 1.05, 1.06 and 1.07 above, are subject to the security interests of the secured creditors listed on Exhibit "F" and that the interests of the secured creditors in and to the assets purchased shall remain perfected security interests until the secured creditors have been paid the amounts listed on Exhibit "F" as the amount that Buyer agrees to assume, or until the security interests are released by the secured creditor(s). It is the understanding of Seller that Buyer will negotiate with each of the secured creditors, terms upon which the secured obligations may be settled. Closing of this Agreement shall be subject to Buyer being able to negotiate acceptable terms from each of the secured creditors. In no event shall Buyer's obligations to both the secured and unsecured creditors hereunder exceed the sum of $14,075,007.69.

Section 9.  Indemnification.  Each party agrees to indemnify the other against and hold the other harmless, for a period of thirty six months after closing, from and against any loss, liability, damage or expense suffered or incurred by the other party as the result of any misrepresentation or breach of warranty or covenant contained herein. The damages suffered by a party shall include, but not be limited to, reasonable costs and attorney's fees incurred in connection with enforcing its rights under this Agreement.

Section 10.  Right of Offset.  Subject to the remaining provisions of this paragraph 10, Seller hereby expressly agrees that Buyer may pay a creditor of Seller direct, for any sum which is or may be claimed to be a lien against any of the Property being transferred hereunder (a "Lien Creditor") and such payment(s) shall be offset against amounts due Seller hereunder. In addition, subject to the remaining provisions of this Paragraph 10, Buyer may have offset or may offset, as the case may be, from time to time as circumstances may entitle Buyer, against any payment to Seller due hereunder, any other amounts as Buyer may be entitled to be indemnified against pursuant to

5

Paragraph 9. The right of offset set forth herein is in no way intended to limit or prevent the indemnification set forth in Paragraph 9 or any additional rights and remedies Buyer may have under this Agreement. Prior to the exercise of its right of offset, Buyer must first give Seller written notice of its claimed right of offset, identifying the person to whom the offset is allegedly owed, the amount of offset and the nature of the claimed offset. Seller shall then have thirty (30) days in which to settle or otherwise satisfy the claimed offset ("the thirty day period"). At the expiration of the thirty day period, if Seller does not settle or satisfy the claimed offset, Buyer may then pay the amount and exercise the offset by giving Seller a written statement identifying the offset by date, amount, and person or entity paid. Notwithstanding any provision in this Paragraphs 10 to the contrary, if Seller within the thirty day period notifies Buyer in writing that Seller disputes Buyer's claimed offset (other than a right of offset resulting from a payment to a Lien Creditor to satisfy a lien against the Property), Buyer shall deposit into escrow the amount for which Buyer claims offset. The escrow shall be maintained by Carl E. Kingston, attorney at law, or if Carl E. Kingston is unwilling or unable to act as escrow holder, by a third party mutually selected by Buyer and Seller acting in good faith. The escrowed funds will be released from escrow to the appropriate party upon final determination (a final non-appealed judgment by a court of competent jurisdiction or a written agreement of the parties) of the dispute between Buyer and Seller. Seller agrees to pay all costs of the escrow, any interest, late fees, court costs and attorney's fees awarded to a third party claimant to the escrowed funds and all costs of defending against the claims of any third party claimant to the escrowed funds, including attorney's fees.

Section 11. Seller's Existing Contracts. The parties acknowledge that Seller currently has several contracts with customers where Seller is obligated to provide goods or services after the contemplated closing date of this Agreement. Seller shall provide Buyer with a list of all such contracts, together with complete copies of all such contracts and related work papers, prior to closing. Buyer shall determine in its sole discretion, which contracts Buyer will assume and complete on behalf of Seller and which contracts Buyer chooses not to assume. Seller shall be entitled to complete any contract rejected by Buyer and to collect the income/payments from any contract that Buyer does not assume and complete. If any contract customer notifies either Buyer or Seller that such customer does not want Buyer to assume and complete its contract with Seller, Seller shall be entitled to complete such contract. Buyer will assume as of closing, those contracts listed on Exhibit "G" attached and those contracts accepted by Buyer as set forth above in this Paragraph 11. In addition, all purchase orders for inventory which

*E.7.*

*CR*

have not been delivered prior to closing, will be assumed by Buyer in the same manner as the inventory described in §1.01 above.

Section 12.  Seller's Right to Audit Buyer's Records.  Seller shall retain the right upon proper notice and during regular business hours, to audit Buyer's books and records related to Buyer's accounts receivables, for a period of six months after the date of closing, in order to verify that any account receivable belonging to Seller and collected by Buyer, has been paid over to Seller.

Section 13.  Assumed and Excluded Liabilities.  Buyer shall assume and agree to pay only those liabilities listed on Exhibit "F" attached hereto and made a part hereof. All liabilities not expressly assumed hereunder are specifically retained by Seller.

Section 14.  Brokerage Commissions.  Buyer and Seller expressly warrant to each other that no broker or finder was retained or in any way involved  in connection with this Agreement and no commission is due as a result of the execution of this Agreement. Any claim to any such brokerage commission shall be satisfied solely by the party the broker claims to be working by, through or under.

Section 15.  Conditions to Closing.  Closing of this Agreement is subject to obtaining all necessary approvals of third parties, and there being no injunction or court order and no changes in the applicable law.

Section 16.  Fees and Expenses.  The parties agree that Buyer and Seller shall each be responsible to pay its own attorneys, accountants and professional fees related to this transaction, whether or not it closes.

Section 17.  Notices.  Any notices required or permitted under this Agreement shall be deemed to be delivered when deposited in the United States mail, postage prepaid, or when personally served upon the other party as follows:

|  |  |
|---|---|
| To Seller: | To Buyer: |
| C. W. Mining Company | Hiawatha Coal Company, Inc. |
| c/o Charles Reynolds | c/o Elliot Finley |
| P. O. Box 65809 | P. O. Box 1202 |
| Salt Lake City, Utah  84165 | Hiawatha, Utah  84528 |

Section 18.  Non-Assign Ability.  This Agreement and any rights and obligations hereunder shall not be transferred or assigned to another party without the prior written consent of the non-assigning party.

Section 19.  Governing Law.  This Agreement and its terms and conditions shall be construed and interpreted pursuant to the laws of the State of Utah.

Section 20.  Execution of Documents.  At closing, Seller agrees to deliver to Buyer such bills of sale, assignments and other documents as are sufficient to vest in

7

Buyer good and merchantable title to the Property and to take all other steps necessary to put Buyer in possession, ownership and control of the Property. Buyer shall take possession of the Property at closing and all receivables generated after closing shall belong to Buyer. The parties hereto agree to execute and deliver any and all other documents necessary and convenient to effectuate the sale and purchase herein provided for, and both Seller and Buyer, as an inducing condition, represent that they have the authority to enter into this Agreement and to make the foregoing commitments for themselves.

Section 21. Closing. Closing of this Agreement shall occur on or before June 30, 2008, as early as practical, unless extended beyond that time by written agreement of the parties. Closing shall occur at the law offices of Paul Toscano, 9 Exchange place, Salt Lake City, Utah, or at such other place as the parties may agree. Each party shall initiate and timely perform its obligations hereunder so as to ensure closing within the period herein specified.

Section 22. Buyer's On-site Representative. Upon the execution of this Agreement, Buyer shall have the right to have its representative on site at the business premises, during all normal business hours, to assist in the transition of the business Property from Seller to Buyer.

Section 23. Union. Buyer acknowledges that Seller is a party to a collective bargaining agreement with International Association of United Workers Union. Buyer agrees to bargain with that union after the closing.

Section 24. Seller's Existing Employees. The parties acknowledge and agree that Buyer shall have the right in its sole discretion to determine which, if any, of Seller's current employees Buyer shall hire. Seller shall be responsible for all costs relating to the termination of employees not hired by Buyer, including but not limited to accrued vacation pay, severance pay, termination pay and any union obligations.

Section 25. Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, unless otherwise specifically recited. There are no representations, warranties, conditions, or obligations except as herein specifically provided. Any waiver, amendment or modification hereof must be in writing. A waiver in one instance shall not be deemed to be a continuing waiver in any other instance.

IN WITNESS WHEREOF, the parties have executed this instrument on this 24 th day of June, 2008, by their duly authorized representatives, each of which

E-7.

representatives, by signing this Agreement, personally represents and guarantees his authority to sign for the party indicated.

ATTEST:

C. W. Mining Company, Seller

_President_
Title

_Charles Reynold_
By

ATTEST:

Hiawatha Coal Company, Buyer

_President_
Title

_Elliot Finley_
By

## Bill of Sale

Know all men by these presents:

That C. W. MINING COMPANY, the SELLER, for and in consideration of the sum of

Dollars ($ 14,075,002.69 to it in hand paid by HIAWATHA COAL COMPANY, INC., the BUYER,

the receipt of which is hereby acknowledged, as bargained, sold, assigned and transferred, and by

these presents does bargain, sell, assign and transfer unto said BVUYER, **AS IS, WHERE IS,**

**WITHOUT WARRANTY AS TO FITNESS OR CONDITION,** that certain personal property

now at Bear Canyon, Emery County, State of Utah particularly described as follows:

See Exhibit "A" attached hereto and made a part hereof.
through "E" CR

And the Seller upon the consideration recited above warrants ownership of and good title to

said property, the right to sell the same and that there are no liens, encumbrances or charges

thereon against the same, except for those liens and encumbrances disclosed in that certain

Purchase and Sale Agreement between the parties of even date herewith, and SELLER agrees to

defend the title and possession transferred to the BUYER against all other lawful claims.

In Witness Whereof, Seller has hereunto set its hand this _24 th_ day of June, 2008.

C. W. Mining Company

By C. W. Reynolds, President

# EXHIBIT C



Online Services | Agency List | Business

Search

**Utah** Department of **Commerce**

# Business Entity Search

?Help

| Name | Type | City | Status |
|------|------|------|--------|
| HIAWATHA COAL COMPANY, INC. | Corporation | Salt Lake City | Active |

**Business Name:** HIAWATHA COAL COMPANY, INC.
**Entity Number:** 1363607-0142
**Registration Date:** 06/30/1997
**State of Origin:** UT

## Address

3212 S STATE ST
Salt Lake City, UT 84115

## Status

**Status:** Active
**Status Description:** Good Standing
**This Status Date:** N/A
**Last Renewed:** 06/20/2008
**License Type:** Corporation - Domestic - Profit
**Delinquent Date:** 06/30/2009

## Registered Agent

**Registered Agent:** CARL E KINGSTON
[Search BES]  [Search RPS]
**Address Line 1:** 3212 S STATE ST
**Address Line 2:**
**City:** Salt Lake City
**State:** UT
**Zip:** 84115

## Additional Information

**Additional Principals:** N
**NAICS Code:** 9999
**NAICS Title:** 9999-Nonclassifiable Establishment
**Stock Class 1 Amount:** 0000050000
**Stock Class 1 Type:** COMMON
**Stock Class 2 Amount:** 0000000000
**Stock Class 3 Amount:** 0000000000
**Stock Class 4 Amount:** 0000000000

**With this information, you can...**

[ Search for Images ]    If you would like to view images of paper filings for this business entity, select the button to the left. You will be assessed a **$ 2.00 fee** per image of a document for this service.

[ Purchase Certificate of Existence ]    If you would like to purchase a Certificate of Existence for this business entity, select the button to the left. You will be assessed a **$ 12.00 fee** for this service. You will need Adobe Reader to view this certificate. If you do not have Adobe Reader, click on the button below and download it.

Get Adobe Reader

[ Access Principal Information ]    If you would like to receive information on the principal individuals associated with this entity, click the button on the left. You will be assessed a **$ 1.00 fee** for this information.

[ Back to search results ]    [ Do Another Search ]

Department of Commerce Home | Division of Corporations Home | Contact Us
Utah.gov Home | Utah.gov Terms of Use | Utah.gov Privacy Policy | Utah.gov Accessibility Policy
Copyright © 2008 State of Utah - All rights reserved.

https://secure.utah.gov/bes/action/searchresults                                                7/7/2008



**utah gov** | Online Services | Agency List | Business | [                    ] [Search]

Utah Department of Commerce — **B u s i n e s s   E n t i t y   S e a r c h**

?Help

| Name | Type | City | Status |
|------|------|------|--------|
| C. W. MINING COMPANY | Corporation | Salt Lake City | Active |

Business Name:      C. W. MINING COMPANY
Entity Number:      836133-0142
Registration Date:      06/10/1983
State of Origin:      UT

**Address**

53 W ANGELO AVE
Salt Lake City, UT 84115

**Status**

Status:      Active
Status Description:      Good Standing
This Status Date:      N/A
Last Renewed:      06/20/2008
License Type:      Corporation - Domestic - Profit
Delinquent Date:      06/10/2009

**Registered Agent**

Registered Agent:      CARL E. KINGSTON
     [Search BES]  [Search RPS]
Address Line 1:      53 W ANGELO AVE
Address Line 2:
City:      Salt Lake City
State:      UT
Zip:      84115

**Additional Information**

Additional Principals:      N
NAICS Code:      3122
NAICS Title:      3111-Tobacco Manufacturing
Stock Class 1 Amount:      0000050000
Stock Class 1 Type:      COMMON
Stock Class 2 Amount:

**With this information, you can...**

[ Search for Images ]    If you would like to view images of paper filings for this business entity, select the button to the left. You will be assessed a **$ 2.00** fee per image of a document for this service.

[ Purchase Certificate of Existence ]    If you would like to purchase a Certificate of Existence for this business entity, select the button to the left. You will be assessed a **$ 12.00 fee** for this service. You will need Adobe Reader to view this certificate. If you do not have Adobe Reader, click on the button below and download it.

[Get Adobe Reader]

[ Access Principal Information ]    If you would like to receive information on the principal individuals associated with this entity, click the button on the left. You will be assessed a **$ 1.00 fee** for this information.

[ Back to search results ]    [ Do Another Search ]

Department of Commerce Home | Division of Corporations Home | Contact Us
Utah.gov Home | Utah.gov Terms of Use | Utah.gov Privacy Policy | Utah.gov Accessibility Policy
Copyright © 2008 State of Utah - All rights reserved.



Utah **Department of** Commerce    # Business Entity Search

?Help

| Name | Type | City | Status |
|---|---|---|---|
| C.O.P. COAL DEVELOPMENT COMPANY | Corporation | Salt Lake City | Active |

| | |
|---|---|
| Business Name: | C.O.P. COAL DEVELOPMENT COMPANY |
| Entity Number: | 738303-0142 |
| Registration Date: | 04/17/1980 |
| State of Origin: | UT |

## Address

53 W ANGELO AVE
Salt Lake City, UT 84115

## Status

| | |
|---|---|
| Status: | Active |
| Status Description: | Good Standing |
| This Status Date: | N/A |
| Last Renewed: | 04/21/2008 |
| License Type: | Corporation - Domestic - Profit |
| Delinquent Date: | 04/17/2009 |

## Registered Agent

| | |
|---|---|
| Registered Agent: | CARL E. KINGSTON |
| | [Search BES]  [Search RPS] |
| Address Line 1: | 3212 SOUTH STATE STREET |
| Address Line 2: | |
| City: | SALT LAKE CITY |
| State: | UT |
| Zip: | 84115 |

## Additional Information

| | |
|---|---|
| NAICS Code: | 4227 |
| NAICS Title: | 4227-Petroleum and Petroleum Products Wh |
| Stock Class 1 Amount: | 0000000000 |
| Stock Class 2 Amount: | 0000000000 |

**With this information, you can...**

| Search for Images |

If you would like to view images of paper filings for this business entity, select the button to the left. You will be assessed a $ 2.00 fee per image of a document for this service.

| Purchase Certificate of Existence |

If you would like to purchase a Certificate of Existence for this business entity, select the button to the left. You will be assessed a $ 12.00 fee for this service. You will need Adobe Reader to view this certificate. If you do not have Adobe Reader, click on the button below and download it.

Get Adobe Reader

| Access Principal Information |

If you would like to receive information on the principal individuals associated with this entity, click the button on the left. You will be assessed a $ 1.00 fee for this information.

| Back to search results |    | Do Another Search |

Copyright © 2008 State of Utah - All rights reserved.

# EXHIBIT D

**DIVISION OF OIL, GAS & MINING**
1594 West North Temple, Suite 1210
Salt Lake City, Utah 84114-5801
(801) 538-5340
Fax (801) 359-3940

**COAL OPERATORS LIST**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| COMPANY NAME | MINE NAME |
|---|---|

**ANDALEX RESOURCES INC.**
\*Mike Glasson, Environmental Coordinator
Andalex Resources
6750 Airport Road
P.O. Box 902
Price, Utah 84501
(435) 637-5385
Fax (435) 637-8860
**E-mail** mglasson@andalex.com

\*Centennial Project--C/007/0019
\*Wildcat Loadout----C/007/0033

**BEAVER BROOK COAL, LLC**
\*Greg Hunt, Vice President
Beaver Brook Coal, LLC
1669 Columbine Lane
Cedaredge, Colorado 81413-9513
Phone & Fax (303) 660-3488
(303) 850-0525  (Donald Brown)
**E-mail** ghunt@protree.com

\*Beaver Brook--EXP/007/0040

**BHP PETROLEUM AMERICAS**
\*Scott Sanders, Manager
BHP Petroleum Americas
Health, Safety, & Environment
1360 Post Oak Blvd., Suite 500
Houston, Texas  77056
(713) 961-8500
Fax (713) 961-8400

\*Knight Mine--C/041/0005
**Final Bond Release on 4-22-98**

**CANYON FUEL COMPANY, LLC**

    **SALT LAKE OFFICE**
    \*Richard Pick, President & CEO
    Canyon Fuel Company, LLC
    6955 Union Park Center, Suite 540
    Salt Lake City, Utah 84047
    (801) 539-4700
    Fax (801) 569-4799

**SUFCO MINE**                                              *SUFCO Mine--C/041/0002
*Ken May, General Manager
Canyon Fuel Company, LLC
397 South 800 West
Salina, Utah 84654
(435) 286-4880
(435) 286-4400  (Ken May)
(435) 286-4421  (Mike Davis)
(435) 286-4420  (Wes Sorenson)
(435) 286-4457  (Craig Hilton)
Fax (435) 286-4499

**E-mail**  (Ken)  kmay@archcoal.com
        (Wes)  wsorenson@archcoal.com
        (Mike)  mdavis@archcoal.com


**SOLDIER CANYON MINE**                          *Soldier Canyon Mine------C/007/0018
*Rick Olsen, General Manager                      *Banning Siding Loadout--C/007/0034
Canyon Fuel Company, LLC                           *Dugout Mine----------------C/007/0039
P.O. Box 1029
Wellington, Utah 84542
(435) 637-6360
(435) 636-2860 (Rick Olsen)
(435) 636-2869 (Vicky Miller)
Fax (435) 636-2897

**E-mail**  (Rick)  rolsen@archcoal.com
        (Vicky)  vmiller@archcoal.com


**SKYLINE MINE**                                           *Skyline Mine--C/007/0005
*John Brasher, Acting Mine Manager
Canyon Fuel Company, LLC
HC 35 Box 380
Helper, Utah 84526
(435) 448-6463  (Mine)
(435) 448-7925  (Mine)
(435) 448-2669  (Chris Hansen)
Fax (435) 448-2632
**E-mail**  (Dan)  dmeadors@archcoal.com
        (Chris)  chansen@archcoal.com


**CASTLE GATE HOLDING COMPANY**          *Castle Gate Mine--C/007/0004
*Dennis Ware, Sr. Environmental Engineer
Castle Gate Holding Company
P.O. Box 30
Helper, Utah 84526-0030
(435) 472-4737  (Dennis Ware)
(435) 472-4744  (John Borla)
Fax (435) 472-4782

**E-mail**  rware@foundationcoal.com

**CONSOLIDATION COAL COMPANY**
*John A. Gefferth, Environmental Engineer
Consolidation Coal Company
P.O. Box 566
Sesser, Illinois 62884
(618) 625-6850 (John Gefferth)
Fax (618) 625-6844
(435) 286-3506 (Mine)
(435) 286-3501 (Steve Behling)
Fax (435) 286-2338
(724) 206-2053 (Jonathan Pachter)
Fax (724) 206-2039
**E-mail** (John) johngefferth@consolenergy.com
        (Steve) stevebehling@consolenergy.com
        (Jonathan) jonathanpachter@consolenergy.com

*Emery Deep Mine-----C/015/0015
*Hidden Valley Mine--C/015/0007

**CO-OP MINING**
*Wendell Owen, Mine Manager
Co-Op Mining Company
P.O. Box 1245
Huntington, Utah 84528
(435) 687-2450 ext. 147
(435) 687-5238 (Charles Reynolds or Mark Reynolds)
Fax (435) 687-2084
**E-mail** cwmining@etv.net

*Trail Canyon Mine--C/015/0021
**Final Bond Release on 12/30/00**
*Bear Canyon Mine--C/015/0025

**GARFIELD COAL COMPANY**
*Al Foster, CEO
Garfield Coal Company
Star Route
Panguitch, Utah 84579
(435) 834-2557
Fax (435) 834-5304

*Davies Coal Mine--PRO/017/0001

**GENWAL RESOURCES, INC.**
*Gary Gray, Resident Agent
Genwal Resources, Inc.
P.O. Box 1077
Price, Utah 84501
(435) 888-4000
(435) 888-4015 (Gary Gray)
(435) 888-5420 (Mine)
Fax (435) 888-4002
**E-mail** ggray@andalex.com
  **Genwal Resources, Inc**
  Centennial Plaza
  45 West 10000 South, Suite 401
  Sandy, Utah 84070
  (801) 265-2300

*Crandall Canyon Mine--C/015/0032

**HIAWATHA COAL COMPANY**
*Mark Reynolds, Resident Agent
Hiawatha Coal Company
P.O. Box 1245
Huntington, Utah 84528
(435) 637-1778 (Elliot Finley)
(435) 687-2450 (Mark Reynolds)
Fax (435) 637-1378
**E-mail** efinley@efinley.com

\*Hiawatha Mine--C/007/0011

**LODESTAR ENERGY, INC**
*Bill Bishop, Lodestar Trustee
2525 Harrodsburg Road, Suite 235
Lexington, Kentucky 40504
(859) 223-7959 (Bill Bishop)
Fax (859) 288-4623
(435) 448-9420

\*White Oak Mine---C/007/001

**HIDDEN SPLENDOR RESOURCES, INC.**
*Derrel Curtis, General Manager
Alexander H. Walker, III, Resident Agent
Hidden Splendor Resources, Inc.
57 West 200 South, Suite 400
Salt Lake City, Utah 84101
(801) 521-3292 (Alex Walker)
Fax (801) 521-3301
(435) 472-1313 (Mine)

\*Horizon Mine------C/007/0020

**MOUNTAIN COAL COMPANY**
Chris Hansen, Environmental Manager
Canyon Fuel Company, LLC
HC 35 Box 380
Helper, Utah 84526
(435) 448-2669
(435) 650-1051  (cell)
Fax (435) 448-2632
**E-mail** chansen@archcoal.com

\*Gordon Creek #2, #7, & #8---C/007/0016
\*Gordon Creek #3 & #6--------C/007/0017
**(Final Bond Release -5/22/98)**
\*Huntington Canyon #4--------C/015/0004
**(Final Bond Release 5/22/98)**

**NEVADA ELECTRIC INVESTMENT CO.**
*Patrick Collins, Resident Agent
Mt. Nebo Scientific
P.O. Box 337
Springville, Utah 84663
(801) 489-6937
Fax (801) 489-6779
**E-mail**  mt.nebo@xmission.com

*Wellington Prep Plant--C/007/0012

**NORTH AMERICAN EQUITIES**
*Jack Otani, Landowner
North American Equities
Star Route
Clearcreek Box 555
Helper, UT  84526

*Blazon #1------FOR/007/0021
Steve Tanner, Landowner
Route #1 Box 146G3
Helper, UT  84526

**PACIFICORP**
*Chuck Semborski, Environmental Supervisor
Energy West Mining Company
P.O. Box 310
Huntington, Utah 84528
(435) 687-2000
(435) 687-4720  (Chuck Semborski)
(435) 687-4825  (Dennis Oakley)
(435) 687-4712  (Doug Johnson)
Fax (435) 687-2695
(801) 220-4612  [Scott Child (Interwest Mining Co.)]
**E-mail** (Chuck)  chuck.semborski@pacificorp.com
        (Dennis)  dennis.oakley@pacificorp.com
        (Scott)  scott.child@pacificorp.com

*Des Bee Dove----------C/015/0017
*Deer Creek--------------C/015/0018
*Cottonwood/Wilberg--C/015/0019
*Trail Mountain----------C/015/0009

**PLATEAU MINING CORPORATION**
*Dennis Ware, Sr. Environmental Engineer
Plateau Mining Corporation
P.O. Box 30
Helper, Utah 84526-0030
(435) 472-0475
(435) 472-4737  (Dennis Ware)
(435) 636-2205  (Star Point Mine)
(435) 636-4741  (cell)
Fax (435) 472-0486

**E-mail**  rware@foundationcoal.com

*Star Point Mine-------C/007/0006
*Willow Creek Mine--C/007/0038

**SAVAGE INDUSTRIES, INC**
*James T. Jensen, Executive Vice President
Savage Industries, Inc.
6340 South 3000 East, Suite 600
Salt Lake City, Utah 84121
(801) 944-6600
Fax (801) 944-6554

(435) 637-5664  (Boyd Rhodes)
Fax (435) 637-2095
(435) 637-2422 (Dan Guy)
**E-mail**  (James)  jinj@savageind.com
       (Boyd)  delynn@castlenet.com
       (Dan)  blackhawk@goldterra.com

*Savage Coal Terminal--C/007/0022

**SUMMIT COAL COMPANY**
*Helen Blonquist
Summit Coal Company
P.O. Box 294
202 South 50 East
Coalville, Utah 84017
(435) 336-2653

*Boyer Mine---C/043/0008
   **Reclamation Complete on 11-27-97**

**SUMMIT MINERALS, INC.**
*David Dawes
Summit Minerals, Inc.
7855 South 155 East
Sandy, Utah 84070
(435) 255-6628  (Home)
(435) 539-0558

*Summit #1 Mine--C/043/0001
   **Reclamation Completed on 4-17-97**
   Gary Boyers
   5925 South 1075 East
   Ogden, UT  84405
   (801) 479-8855  (Office)

**SUNNYSIDE COAL COMPANY**
*Ken Rushton, Trustee
Sunnyside Coal Company
99 West Main #202
Lehi, Utah 84043
(801) 768-8466
Fax (801) 768-4353

*Sunnyside--C/007/0007
   **Reclamation due to Forfeiture**
   **Reclamation Completed on 7-1-99**

**SUNNYSIDE COGENERATION ASSOC.**
*Randy Scott, Plant Manager
Sunnyside Cogeneration Association
P. O. Box 159
Sunnyside, Utah 84539
(435) 888-4476 (ext. 107 for Rusty Netz)
Fax (435) 888-2538
**E-mail**  rjscott@castlenet.com
       rnetz@castlenet.com

*Sunnyside Refuse/Slurry--C/007/0035
*Star Point Refuse--C/007/0042

**UTAHAMERICAN ENERGY, INC.**
*Jay Marshall, Resident Agent                    *Horse Canyon Mine--C/007/013
UtahAmerican Energy, Inc.
P.O. Box 986
Price, Utah 84501
(435) 637-5032 ext. 724 (Jay Marshall)
Fax (435) 613-0805

(740) 926-1351  (Clyde Borrell, Vice President)
Fax (740) 926-1615

**E-mail** (Clyde)  cborrell@coalsource.com
           (Jay)    jaymarshall@sisna.com


**WEST RIDGE RESOURCES, INC**
*Gary E. Gray, Resident Agent                    *West Ridge Mine--C/007/0041
West Ridge Resources, Inc.
P.O. Box 1077
Price, Utah 84501
(435) 888-4015
(435) 888-4000  (Mine Office)
Fax  (435) 888-4002
**E-mail**  ggray@andalex.com


**WESTERN STATES MINERALS CORP.**
*E.M. Gerrick, Vice President of Operations      *J.B. King Mine--C/015/0002
Western States Minerals Corporation                **Final Bond Release on 3-27-00**
250 South Rock Blvd, Suite 130
Reno, NV  89502
(775) 856-3339 ext 13  (Buzz Gerrick)
Fax (775) 856-1818
**E-mail**  emg@wsmcgold.com


Permit Numbers:  **C/+++/***
                                                Revised: June 17, 2004

**C**=Coal       **+++**=County Code     ***=Mine Number

PRO    Proposed Mine        007    Carbon
EXP    Exploration Site     015    Emery
FOR    Forfeiture Site      017    Garfield
                            025    Kane
                            041    Sevier
                            043    Summit


O:\Coal_lists\operators.doc