**The below described is SIGNED.**

**Dated: September 17, 2008**

**JUDITH A. BOULDEN
U.S. Bankruptcy Judge**



_____

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF UTAH

| In re: | |
|---|---|
| C.W. MINING COMPANY, a Utah corporation, | Case No. 08-20105 |
| | Chapter 11 |
| Putative Debtor. | |

## MEMORANDUM DECISION GRANTING AQUILA, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Before the Court is Aquila, Inc.'s (Aquila) Motion for Partial Summary Judgment Regarding Eligibility of Petitioning Creditors to Commence This Involuntary Bankruptcy Case (Aquila's Motion). Aquila's Motion asks the Court to determine whether the three petitioning creditors, Aquila, Owell Precast L.L.C. (Owell), and House of Pumps, Inc. (House of Pumps), were eligible to commence this involuntary case and whether the three petitioning creditors held qualifying claims against the putative Debtor, C.W. Mining Company (Debtor) as of the petition date.

Aquila's Motion has been fully briefed by the parties. Additionally, Standard Industries Inc. (Standard)[1] has filed a Motion to Dismiss the Involuntary Petition (docket no. 73) (Standard's Motion to Dismiss) and a Motion for Summary Judgment to Dismiss the Petition (docket no. 132) (Standard's Motion for Summary Judgment). The Debtor has joined in Standard's motions. Aquila has responded to both motions and neither has been set for hearing. Some of the legal issues in these motions and Aquila's Motion overlap, and the Court will resolve any of the overlapping issues that are included in Aquila's Motion. Any remaining issues raised in Standard's motions or in Aquila's responsive pleadings will be addressed at a later date. The Court has considered the facts properly before it, the written and oral arguments presented, has conducted an independent review of applicable law, and finds that notice was properly given to all parties in interest. Based on the foregoing, the Court makes the following ruling.

### I. JURISDICTION AND LEGAL STANDARD

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a).[2] This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O), and the Court may enter a final order.

Federal Rule of Bankruptcy Procedure 7056 makes summary judgment appropriate when, after consideration of the record, the Court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3] In applying this standard, the Court examines the factual record in the light most favorable to the nonmoving

---

[1] The Court allowed Standard to participate in this matter by virtue of its purported acquisition of the claim of House of Pumps.

[2] Future statutory references will be to title 11 of the United States Code unless indicated otherwise.

[3] FED. R. CIV. P. 56(c).

party.[4] The party opposing summary judgment may not rely on mere allegations or denials in its pleadings or briefs, but must identify specific and material facts for trial and significant probative evidence supporting the alleged facts.[5] There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."[6] The moving party has the burden of establishing that it is entitled to summary judgment.[7]

## II. UNDISPUTED FACTS

The Court finds that the following material facts are undisputed:

1.   Aquila, Owell, and House of Pumps filed an involuntary bankruptcy petition against the Debtor on January 8, 2008 seeking entry of an order for relief under chapter 11.

2.   Aquila signed the involuntary petition as a creditor holding a claim against the Debtor in the amount of $24,891,988 pursuant to a judgment entered against the Debtor and in favor of Aquila that was issued by the United States District Court for the District of Utah (District Court) on October 30, 2007.

3.   The Debtor is appealing the judgment but did not post a supersedeas bond or obtain a stay pending appeal.

4.   House of Pumps signed the involuntary petition as a creditor holding a claim against the Debtor in the amount of $19,255.62 based on trade debt owing.

5.   The unsecured amount of House of Pumps' claim ($19,255.62) alone exceeds

---

[4] *See Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

[5] *Burnette v. Dresser Indus., Inc.*, 849 F.2d 1277, 1284 (10th Cir. 1988).

[6] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[7] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

the aggregate unsecured claim threshold that is required as a minimum total of the claims of all petitioning creditors in order to qualify under § 303(b).

6. Owell signed the involuntary petition as a creditor holding a claim against the Debtor in the amount of $3,440.

7. The involuntary petition was served personally on the Debtor's registered agent on January 9, 2008.

8. The Debtor filed an answer to the involuntary petition on January 30, 2008 and an amended answer on February 13, 2008.

9. In the amended answer, the Debtor challenged the qualifications and eligibility of Aquila and Owell to sign and file the involuntary petition.

10. The Debtor has not and does not challenge the qualifications and eligibility of House of Pumps to sign and file the involuntary petition.

11. The Debtor has more than 12 creditors.

12. Before the involuntary petition was filed, Owell did business with the Debtor providing precast concrete products. Owell invoiced the Debtor for these goods on two invoices: (a) invoice no. 8355 for $13,440 dated September 12, 2007; and (b) invoice no. 8583 for $2,850 dated October 31, 2007.

13. The Debtor paid the $2,850 amount owed on invoice no. 8583 by check dated December 20, 2007.

14. Owell has no record of the Debtor disputing the $13,440 amount owed for the goods provided as shown on invoice no. 8355.

15. On January 5, 2008, the Debtor, through its accounts payable secretary Dolly

Stephens, mailed a check for $3,440 to Owell.

16.     The $3,440 check was drawn from a Far West Bank account in the name of B.W. Stoddard.

17.     Accompanying the check was a note stating: "Here is a portion of that invoice we owe you. (inv #8355). I will get the rest out to you shortly. Thank you for your patience! Dolly Stephens CW Mining 435-687-2450."

18.     On January 7, 2008, Owell received a call from Ken Kingston, the Debtor's purchasing manager, who gave a credit card number to employees at Owell and authorized a credit card payment in the amount of $10,000 for partial payment of invoice no. 8355.

19.     Owell processed the credit card on January 7, 2008 leaving a balance due and owing from the Debtor of $3,440.

20.     The Debtor and Owell, through their representatives, agreed prior to the involuntary petition being filed that Owell would accept the $10,000 credit card payment and the check for $3,440 as payment in full.

21.     On January 11, 2008, Owell received the $3,440 check drawn on the account of B.W. Stoddard.

22.     Owell has not deposited this check, and it remains in Owell's possession.

## II. DISCUSSION

Aquila has asked this Court to grant partial summary judgment in its favor and conclude that it, Owell, and House of Pumps held qualifying claims and were eligible under § 303(b) to file the involuntary petition. Section 303(b)(1) provides:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title —

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $13,475 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.[8]

Under § 303(b), petitioning creditors must have standing to file an involuntary petition.[9] "[A] petitioning creditor does not have standing when its debt is subject to a bona fide dispute"[10] as to liability or amount or when the claim is contingent. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) amended the criteria for commencing an involuntary bankruptcy case. The legislative history summarizes the change:

> Current law renders a creditor ineligible if its claim is contingent as to liability or the subject of a bona fide dispute. This provision amends section 303(b)(1) to specify that a creditor would be ineligible to file an involuntary petition if the creditor's claim was the subject of a bona fide dispute *as to liability or amount.*[11]

Taking into consideration the BAPCPA amendment, the standard adopted by the Tenth Circuit in *Bartmann* is still instructive to this Court's analysis. In *Bartmann*, the court held that when reviewing whether a bona fide dispute exists, a "bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of debt. The court need not determine the probable outcome of the dispute, but merely whether one exists."[12] Incorporating the BAPCPA's amendments into this standard, § 303(b)(1) now specifies that this

---

[8] The claims' aggregate value is adjusted annually with the current value being $13,475.

[9] *Bartmann v. Maverick Tube Corp.,* 853 F.2d 1540, 1543 (10th Cir. 1988).

[10] *Id.*

[11] H.R. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 149 (2005) (emphasis added).

[12] *Bartmann*, 853 F.2d at 1544 (internal citations omitted).

Court must determine whether there is an objective basis for either a factual or legal dispute as the amount or the liability of the petitioning creditors' claims.[13]

### House of Pumps

The parties do not dispute that House of Pumps was eligible to act as a petitioning creditor when the involuntary petition was filed. The subsequent assignment of House of Pumps' claim to Standard and Standard's desire to withdraw as a petitioning creditor does not change that fact.[14] As a result, the Court finds that the material undisputed facts establish that House of Pumps had a claim valued at $19,255.62 that was not contingent as to liability or the subject of a bona fide dispute as to liability or amount when the involuntary petition was filed. Therefore, as a matter of law, House of Pumps was eligible to act as a petitioning creditor.

### Aquila

The facts relevant to determining whether Aquila had standing to file the involuntary petition are also undisputed. The parties agree that Aquila obtained a judgment against the Debtor for over $24 million in 2007, that Aquila has a non-contingent, unsecured claim against the Debtor for the amount of that judgment, that the Debtor is in the process of appealing the judgment, and that the Debtor has not obtained a stay of the enforcement of the judgment. The

---

[13] Both Standard and the Debtor argue that if there are disputed facts regarding whether the petitioning creditors were eligible to file the involuntary petition, then they lacked standing to file the complaint. This argument misses the mark. Whether a petitioning creditor's claim is the subject of a bona fide dispute or is contingent as to liability is a conclusion of law that this Court will make based on the undisputed facts presented in a motion for summary judgment or based on the facts presented at trial. The existence of disputed facts would not in and of themselves rob the petitioning creditors of standing.

[14] *See Bartmann*, 853 F.2d at 1544 (stating that "[p]ost-petition payment of a debt does not affect whether the debt is subject to a bona fide dispute. A bankruptcy court determines the number of petitioning creditors filing an involuntary bankruptcy petition on the date that the petition is filed") (internal citations omitted).

Court must now determine if Aquila is entitled to judgment on the issue of standing as a matter of law.

The parties disagree about whether the appeal is sufficient to demonstrate that there is a bona fide issue as to the validity or amount of Aquila's claim. Aquila argues that the Court should adopt the majority view, as set forth in *In re Drexler*[15] that the appeal of a judgment alone does not create a bona fide dispute as to liability or amount. In *Drexler*, two judgments were entered against the debtor in federal court.[16] The money judgment was entered after various evidentiary hearings at which the debtor represented himself and at which he admitted to liability.[17] The second "companion judgment" struck the debtor's answer and counterclaim and directed judgment by default on the balance of the complaint.[18] The court in *Drexler* held that the appeal of these unstayed judgments was insufficient to create a bona fide dispute. Standard and the Debtor, on the other hand, argue the minority view that the appeal of a judgment is sufficient to create a bona fide dispute and that under the reasoning articulated in *In re Byrd*[19] they have shown that a legal or factual dispute exists as to the validity of the debt. This Court chooses to

---

[15] *In re Drexler*, 56 B.R. 960, 967 (Bankr. S.D.N.Y. 1986).

[16] *Id.* at 961-62.

[17] *Id.* at 962.

[18] *Id.*

[19] 357 F.3d 433, 438 (4th Cir. 2004) (refusing to adopt a *per se* rule that the existence of an unstayed, appealed judgment alone is sufficient to establish that no bona fide dispute exists, but nonetheless finding that the debtor failed to offer any evidence to support his contention that a bona fide dispute exists).

adopt the line of case law holding that an unstayed judgment, as to which an appeal is taken by the debtor, is not generally the subject of a bona fide dispute.[20]

In so deciding, the Court acknowledges that it is Aquila's burden to establish a prima facie case that its claim is not the subject of a bona fide dispute as to liability or amount.[21] Liquidation of its claim to judgment, however, provides Aquila significant weight to carry that burden. Even the *Byrd* court has conceded that the reduction of a claim to judgment goes a long way in establishing that a claim is not the subject of a bona fide dispute and that "it will be the unusual case in which a bona fide dispute exists in the face of claims reduced" to judgments.[22] But it is not just reduction of the claim to judgment by the District Court that is determinative. The District Court issued the judgment after a three-day trial on the merits of the case in which it accepted Aquila's evidence and rejected the Debtor's defenses. The judgment is supported by well reasoned and legally supportable Amended Findings of Fact and Conclusions of Law (Amended Findings and Conclusions). There is no assertion by the Debtor or Standard that the District Court lacked jurisdiction or that the judgment was procured by fraud.[23] The Debtor and Standard have failed to point this Court to any other opinion where a federal district court's decision, after a three-day trial on the merits, has led a bankruptcy court to find that there is a

---

[20] *Drexler*, 56 B.R. at 967; *see also In re Norris*, 183 B.R. 437, 452-54 (Bankr. W.D. La. 1995).

[21] *Bartmann*, 853 F.2d at 1544.

[22] *Byrd*, 357 F.3d at 438. This Court would add that a judgment obtained after a three-day trial on the merits of the case goes even farther to establish that there is no bona fide disputed than a judgment obtained through a confession or default.

[23] *Abboud v. Abboud (In re Abboud)*, 237 B.R. 777, 782 (10th Cir. BAP 1999) (when considering a claim based upon a judgment, a bankruptcy court should confine its review to want of jurisdiction of the trial court or whether the judgment was procured by fraud) (citing *Heiser v. Woodruff*, 327 U.S. 726 (1946)).

bona fide dispute as to liability or amount when that judgment is appealed. Under these circumstances, this Court has no reservations about adopting the reasoning in *Drexler* that "[i]t would be contrary to the basic principles respecting, and would effect a radical alteration of, the long-standing enforceability of unstayed final judgments to hold that the pendency of the debtor's appeal created a 'bona fide dispute' within the meaning of § 303."[24] Consequently, this Court finds that Aquila has met its burden of establishing that its claim is not the subject of a bona fide dispute.

In deciding to follow *Drexler* and reject *Byrd*, the Court has reviewed the reasoning in *Byrd* and finds that it is at best difficult to apply and, at worst, it subjects bankruptcy courts to various pitfalls including the potential second-guessing of final, enforceable judgments.[25] In *Byrd*, the court instructed courts to inquire into the genuineness of the debtor's appeal to determine if

---

[24]     *Drexler*, 56 B.R. at 967.

[25]     In addition to the cases cited up to this point, the Court has also reviewed the following cases: *In re Graber*, 319 B.R. 374, 379 (Bankr. E.D. Pa. 2004) (adopting the *Byrd* analysis and reviewing state court, default judgments that were the subject of pending motions to open and/or strike finding that the debtors contentions about her liability to the creditors "raise substantial factual and legal questions which have never been tested"); *In re Raymark Industries, Inc.*, 99 B.R. 298, 301-302 (Bankr. E.D. Pa. 1989) (holding the creditors with stayed judgments lacked standing to file an involuntary petition but that those creditors with unstayed judgments were eligible to act as petitioning creditors); *In re Prisuta*, 121 B.R. 474, 476 (Bankr. W.D. Pa. 1990) (distinguishing the case from *Drexler* stating that the debtor had demonstrated that the state court judgments obtained through a confession of judgment and default were subject to bona fide disputes); *In re Atlantic Portfolio Analytics & Mgmt., Inc.*, 380 B.R. 266, 274 (Bankr. M.D. Fla. 2007) (finding that the there was no "new evidence or legal authority in support of reversal" of the unstayed, appealed judgment obtained in a adversary proceeding and that the parties failed to identify a genuine issue of material fact that bears upon liability or "demonstrated a meritorious contention as to the application of law to undisputed facts"); *In re Amanat*, 321 B.R. 30, 37-38 (Bankr. S.D.N.Y. 2005) (finding that there was support for the *per se Drexler* rule but finding under *Byrd* that the debtor failed to overcome the presumption that the state court judgment was valid and not subject to a bona fide dispute because the only evidence presented was the debtor's own testimony that he believed he had a valid defense and that he had filed a notice of appeal).

there is a bona fide dispute.[26] Other Courts have applied *Byrd* with very little analysis and usually only a general statement indicating that the debtor has failed to shoulder its burden of objectively establishing whether legal and factual disputes exist.[27] *In re Graber*[28] is the only case that this court has found that has actually attempted to apply and really analyze *Byrd*. Therefore, this Court will rely on it and *Byrd* to conduct its analysis.

As stated in *Byrd*, once the petitioning creditor has made its prima facie case by presenting unstayed judgments in its favor, the burden shifts to the debtor to demonstrate the existence of a bona fide dispute.[29] The debtor must come forward with more than the same argument made to the judgment court and with more than a subjective belief that the debtor's argument is correct.[30] And it would be entirely unworkable and inappropriate for the debtor to present new supporting evidence not presented to the judgment court. Here, the Debtor and Standard have offered to this Court their belief and argument that the District Court simply got it wrong. Specifically, in a rather truncated version of the District Court's judgment, Standard argues:

> Among other things, the court entering the judgment held that the contract between [the Debtor] and Aquila defined '*force majeure*' to include any cause beyond [the Debtor's] reasonable control that would even partly prevent the mining of coal, and that if [the Debtor] gave Aquila written notice of a *force majeure* event its obligation to perform would be suspended. The [c]ourt also held that [the Debtors] had a labor dispute which qualified as a *force majeure* event, that the labor dispute impacted [the Debtor's] coal production at least in part, and

---

[26] *Byrd*, 357 F.3d at 440-41.

[27] *See e.g. Atlantic Portfolio Analytics & Mgmt.,* 380 B.R. at 274; *Amanat*, 321 B.R. at 37-38.

[28] 319 B.R. 374, 377 (Bankr. E.D. Pa. 2004) (analyzing whether state court judgments are the subject of a bona fide dispute under the framework established in *Byrd*).

[29] *Byrd* 357 F.3d at 439.

[30] *Id.* at 440.

that [the Debtor] gave Aquila written notice of the labor dispute as a *force majeure* event. These findings and conclusions by the court required a judgment in favor of [the Debtor] rather than Aquila.[31]

The Debtor and Standard seem to be relying on the following statement made by the District Court:

> Even though [the Debtor] did provide Aquila written notice of its labor problems, [the Debtor] has not met its burden of showing that the labor problems by themselves excuse [the Debtor's] failure to perform. Although the labor problems had some impact on [the Debtor's] coal production, how much impact is not clear. In fact, the evidence leads the court to conclude that [the Debtor's] failure to perform was caused, primarily, by its various geological problems and not by the labor dispute. Accordingly, [the Debtor] cannot rely on the force majeure provision of the Contract to excuse its failure to perform.[32]

Due to the lack of evidence presented during the three-day trial, it appears that the District Court was simply unable to conclude what impact the labor dispute had on the Debtor's failure to perform. It appears from the record that the Debtor has already made its argument to the District Court and the District Court rejected this argument. This is the same argument that the Debtor is making on appeal, and it is merely the Debtor's subjective belief that the District Court came to the wrong legal conclusion that is the basis for the argument that there is a bona fide dispute as to the liability or amount of Aquila's claim. As stated in *Byrd*, a subjective belief does not give rise to a bona fide dispute.[33] The Court has reviewed the District Court's Amended Findings and Conclusions as well as the Debtor's appellate brief and finds that there does not appear to be an objective basis for either a factual or a legal dispute that the Debtor is liable for the judgment or that there is any dispute as to the amount of the claim.

---

[31] Standard's Mem. In Opp. at p. 9-10.

[32] Standard's Mem. In Supp. of Mot. to Dismiss Exh. 3.

[33] *Byrd*, 357 F.3d at 441.

For these reasons, the Court finds that the judgment is sufficient to establish that Aquila had a qualifying claim that was not the subject of a bona fide dispute and was, therefore, eligible to be a petitioning creditor when the involuntary petition was filed.

**Owell**

The Debtor contends that Owell cannot be a qualified petitioning creditor because the Debtor had satisfied the debt it owed to Owell before the involuntary petition was filed. Additionally, the Debtor argues that there is a factual or legal dispute as to its liability on Owell's claim because there are genuine issues of material fact as to whether the original debt was satisfied and Owell's claim was extinguished prepetition through a substitution of contract, a novation, or an accord and satisfaction.

During oral argument, the Debtor and Standard narrowed the issue even further arguing that there was a genuine issue of material fact regarding the terms of the new agreement between Owell and the Debtor as evidenced by the Dolly Stephens, Ken Kingston, and Charles Reynolds declarations. Specifically, Standard and the Debtor argue that it was at the very least unclear whether the parties agreed that the mere mailing of the $3,440 check constituted payment in full of the debt the Debtor owed to Owell or whether the agreement was that full payment would not be realized until Owell actually received the $3,440 check. The Debtor and Standard argue that this lack of clarity regarding the contract terms is a material issue of fact that precludes the Court from granting this portion of Aquila's Motion or even establishes a bona fide dispute that would disqualify Owell as a petitioning creditor.

Aquila has come forward with the following undisputed facts: the Debtor and Owell agreed that as of January 4, 2008, the Debtor owed Owell at least $13,440; Owell agreed to

accept the $10,000 credit card payment and the check for $3,440 as payment in full of its debt; and the $3,440 check was mailed on January 5, 2008 but was not received until January 11, 2008. Once the movant makes a properly supported motion, the burden shifts to the nonmovant to demonstrate the existence of a genuine dispute. The nonmovant must set forth *specific facts* showing that there is a genuine issue for trial. A careful review of the statements included in the declarations, even viewed from a perspective most favorable to the nonmoving party, does not reveal a genuine dispute. Nowhere in any of the declarations does it say that Owell's debt would be extinguished when the Debtor placed the $3,440 check in the mail. Contrary to the Debtor and Standard's arguments, there are no facts before this Court showing that the new agreement included terms expressly providing that the debt would be satisfied upon the mailing of the $3,440 check. Attorneys cannot create a dispute through their own speculation about what may have happened or what may have been included in a particular agreement or their parsing of the declarations. If the nonmovants in this case cannot point the Court to specific material disputed facts to support their attorneys' speculation, then their arguments fail.

Nor do the Debtor and Standard's legal arguments challenging Owell's standing to be a petitioning creditor defeat Aquila's Motion. Generally, "[p]ayment is not effectuated by sending the amount due to the creditor in the mail or other public carrier until the remittance gets into the hands of the creditor, unless he or she expressly or by implication directs or consents that payment be made in that manner. . . ."[34] In addition to the general statement of common law, the Court

---

[34] 70 CORPUS JURIS SECUNDUM, Payment § 11*; see also Cortez v. Cortez,* 172 P.3d 615, 618-19 (N.M. Ct. App. 2007) (summarizing the general rule that the mailing of a check does not constitute payment). The court in *Cortez* summarized the following authorities:
  *Nguyen v. Calhoun*, 105 Cal.App.4th 428, 129 Cal.Rptr.2d, 436, 448-49 (2003) (stating the general rule that depositing a check in the mail does not constitute payment unless the creditor has directed that the payment be mailed, and merely supplying a mailing address

finds that under various additional legal theories the placing of a check in the mail does not extinguish or discharge a debt. In *Barnhill v. Johnson*[35] the Supreme Court held that a preferential transfer occurs under § 547 when the check is honored by the bank, not when the creditor receives the check.[36] The Supreme Court indicated that the same analysis would hold true under Article 3 of the Uniform Commercial Code.[37] If under *Barnhill*, a transfer doesn't occur until the check is honored by the bank, how could the mere mailing of a check extinguish a debt? The debt would remain until the recipient negotiated the check. Furthermore, in applying Colorado state law (which comports with general common law), the Tenth Circuit stated: "In general, a debt is discharged not when the debtor mails a check, but when the creditor negotiates the check."[38] The Debtor and Standard have not argued that Owell received or negotiated the

---

does not constitute a direction to mail the payment); *Enriquillo Exp. & Imp., Inc. v. M.B.R. Indus., Inc.*, 733 So.2d 1124, 1126-27 (Fla. Dist. Ct. App.1999) (holding that simply placing a check in the mail does not constitute a payment, and "[i]n the absence of an express agreement otherwise, the debtor owes his creditor nothing less than the unconditional delivery of money on or before the last day specified for payment"); *Werne v. Brown*, 955 P.2d 1053, 1055 (Colo. Ct. App. 1998) ('Generally, payment by mail is not effective until receipt by the creditor, unless the creditor expressly, by implication, or through a course of dealing, directs or consents otherwise. If payment by mail is directed or authorized by the creditor, however, the time of delivery is the time that the payment, properly addressed with postage prepaid, is put in the mail.'); *Buffalo Pipeline Co. v. Bell*, 694 S.W.2d 592, 596-97 (Tex. Ct. App.1985) (stating that there was not a proper or timely tender of payment in the absence of contractual provision for payment by mail, or an established custom or course of dealing by mail).

*Cortez,* 172 P.3d at 615.

[35]    503 U.S. 393, 400 (1992).

[36]    *Id.*

[37]    *Id.* at 398. The Court notes that Utah has adopted the Uniform Commercial Code.

[38]    *Dean Witter Reynolds Inc. v. Variable Annuity Life Ins. Co.,* 373 F.3d 1100, 1108 (10th Cir. 2004) (citing *Denver Elec. & Neon Corp. v. Phipps, Inc.*, 143 Colo. 530, 354 P.2d 618, 623 (1960); *see also Nguyen v. Calhoun*, 105 Cal.App.4th 428, 129 Cal.Rptr.2d 436 (2003) (in general, the deposit of a payment check in the mail does not constitute payment; debtor assumes the risk that the deposited payment will be delivered and received by the creditor)).

$3,440 check before it signed the involuntary petition on January 8, 2008. The undisputed fact before this Court is that Owell did not receive the $3,440 check until January 11, 2008. As a result, the check could not have been negotiated and the Owell debt satisfied before that date.

Standard also maintains that under Utah Code Ann. § 78B-5-802(1) the check was an offer in writing to pay a particular sum of money that, if not accepted, was equivalent to the actual production and tender of the money and, therefore, it had paid the debt owed to Owell in full as of January 5, 2008 when its employee sent the check to Owell. Standard's reliance on this statute is misplaced. The undisputed facts establish that the Debtor sent a check (the instrument) to Owell with a note stating: "Here is a portion of that invoice we owe you. (invoice #8355). I will get the rest out to you shortly. Thank you for your patience! Dolly Stephens CW Mining 435-687-2450." The note (although it is cursory and informal) may be an offer in writing, but the Court agrees with Aquila's argument that the temporal event of "receipt" of the offer in writing must occur before the creditor has the opportunity "not to accept" it. Therefore, tender cannot occur until the offer in writing has at least been received, and the undisputed facts show that the note and the check were not received until January 11, 2008. For these reasons, the Court finds as a matter of law that Owell's claim had not been extinguished or satisfied when the involuntary petition was filed.

Standard and the Debtor maintain that a material issue of fact exists regarding the amount of the Owell debt after the $10,000 credit card payment was authorized. The argument is that the amount of the debt is disputed because either the Debtor owed Owell the $3,440 balance as of the date of the petition or some higher amount based on accrued finance charges. Whether finance charges were applied and whether they were owed to Owell may be a question of fact but it is not

material to the resolution of whether Owell was an eligible petitioning creditor. The undisputed material fact is that after the $10,000 credit card payment on January 7, 2008, the Debtor owed Owell at least $3,440 and that amount is not the subject of a bona fide dispute.[39]

### III. CONCLUSION

The undisputed facts establish that each of the petitioning creditors held noncontingent claims that were not the subject of a bona fide dispute when the involuntary petition was filed. As a result, the petitioning creditors each had standing to file the involuntary petition. For the reasons given above, this Court **GRANTS** Aquila's Motion. The Court will issue a separate order.

-----------------------------------------END OF DOCUMENT-------------------------------------



---

[39] *See IBM Credit Corp. v. Compuhouse Systems, Inc.*, 179 B.R. 474, 479 (W.D. Pa. 1995) (stating that "it is clear that if at least a portion of the debt that is the subject of the petition is undisputed, the undisputed portion is sufficient to create a debt under Section 303(b)(1) not subject to a bona fide dispute) *aff'd.* 85 F.3d 612 (3rd Cir. 1996) (table) (internal citations omitted).

_____ooo0ooo_____

# SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION GRANTING AQUILA,**

**INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT** will be effected through the

Bankruptcy Noticing Center to each party listed below:

Paul James Toscano
10 Exchange Place
Suite 614
Salt Lake City, UT 84111
    *Debtor's Counsel*

Russell S. Walker
Woodbury & Kesler
265 East 100 South
Suite 300
Salt Lake City, UT 84111
    *Debtor's Counsel*

Keith A. Kelly
Steven W. Call
Steve Strong
Ray Quinney & Nebeker, P.C.
36 South State St., Suite 1400
P.O. Box 45385
Salt Lake City, UT 84145-0385
    *Counsel for Aquila, Inc.*

Conrad H. Johansen
Tyler Foutz
Olsen Skoubye & Nielson
999 East Murray-Holladay Road
Suite 200
Salt Lake City, UT 84117
    *Counsel for Owell Precast LLC*

John T. Morgan
US Trustees Office
Ken Garff Bldg.
405 South Main Street
Suite 300
Salt Lake City, Ut 84111

David E. Leta
Snell & Wilmer
15 West South Temple
Suite 1200
Beneficial Tower
Salt Lake City, UT 84101-1547

F. Mark Hansen
F. Mark Hansen, P.C.
431 North 1300 West
Salt Lake City, UT 84116
    *Counsel for Standard Industries, Inc.*