**The below described is SIGNED.**



**Dated: April 23, 2009**    _____

**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

|  |  |
|---|---|
| In re: | Case No. 08-20105 |
| **C.W. MINING COMPANY**, a Utah corporation, | Chapter 7 |
| Debtor. | |

***AMENDED* MEMORANDUM DECISION DENYING COP COAL DEVELOPMENT COMPANY'S MOTION TO REQUIRE THE TRUSTEE TO ASSUME OR REJECT LEASE, AND GRANTING TRUSTEE'S MOTION TO EXTEND TIME FOR TRUSTEE TO ASSUME OR REJECT EXECUTORY CONTRACTS OR UNEXPIRED LEASES OF THE DEBTOR**

Before the Court are two motions: (1) C.O.P. Coal Development Company's (COP)

Motion to Require the Trustee to Assume or Reject Lease (Assumption Motion); and (2) the

chapter 7 trustee's Motion to Extend Time for Trustee to Assume or Reject Executory Contracts

or Unexpired Leases of Debtor (Extension Motion).

The parties have briefed the legal issues and presented evidence and argument to the

Court.  Following four days of evidence concluded shortly before the expiration of the time limit

specified in 11 U.S.C. § 365(d)(4)(A)(i),[1] these matters were taken under advisement.  After

considering the evidence, assessing the credibility of the witnesses, considering the arguments of

counsel, and conducting an independent review of applicable case law, the Court issued orders

denying the Assumption Motion and granting the Extension Motion immediately prior to the

expiration of the statutory period.  This Memorandum Decision contains the findings of fact and

conclusions of law supporting those orders.

## I.  JURISDICTION

Jurisdiction is proper under  28 U.S.C. §§ 1334 and 157(a).  This is a core matter under

28 U.S.C. § 157(b), and this Court may make a final determination.

## II.  FACTS

### Status of the Case

Aquila, Inc. (Aquila) and others filed an involuntary chapter 11 petition against C.W.

Mining Company (Debtor) at 3:36 p.m. prevailing MST on January 8, 2008.  Aquila is a judgment

creditor of the Debtor, having obtained a $24 million judgment against the Debtor in October

2007 through proceedings in the United States District Court for the District of Utah (USDC).

The Debtor answered the involuntary petition, disputing the allegations contained therein, but an

order for relief was entered on September 26, 2008.  Shortly thereafter, Aquila filed a Motion For

Appointment of Chapter 11 Trustee, or Alternatively, to Convert Case to Chapter 7 (Conversion

Motion).  This Court granted the Conversion Motion, and the case was converted to a chapter 7

---

[1]        All future statutory references are to title 11 of the United States Code unless otherwise
indicated.

case on November 13, 2008.  After a disputed election, on January 8, 2009 the Court ordered that

the interim trustee Kenneth A. Rushton (Trustee) serve as the trustee in the chapter 7 case.

**The Agreement**

The Assumption Motion and Extension Motion relate to certain real property and other

executory contracts and leases.  The real property lease, designated as the Coal Operating

Agreement (Agreement), was executed in March of 1997 by Ben Stoddard, as president of the

Debtor, and Joe Kingston, as president of COP.  Under the Agreement, COP as owner granted

the Debtor as operator, among other things, the exclusive right to mine and remove coal from

various tracts of land, including the Bear Canyon Mine, for a period of 25 years.  The Debtor

operated the Bear Canyon Mine under this Agreement from 1997 forward.  *In 2000, the*

*Agreement was modified to defer 50% of the royalties payable by the Debtor to COP until such*

*time as the Debtor reached certain production volumes, or until the Debtor had installed certain*

*mining equipment.*  Between late 2003 and 2005, a contract dispute arose between the Debtor

and Aquila that resulted in the $24 million judgment.  Sometime in late 2007, the Debtor changed

its mining method from continuous mining to longwall mining in an attempt to increase

production and revenue.

On November 9, 2007, Joe Kingston on behalf of COP sent a letter to Charles Reynolds

(Reynolds), president of the Debtor since 2004, informing him that the Debtor was in default

under the terms of the Agreement, spelling out the specific defaults including delinquent royalty

payments and accounting for coal removed, and explaining the steps that the Debtor needed to

take to cure those defaults (Default Notice).  The default provision of the Agreement states:

> If [Debtor] shall not comply with any of the provisions, or covenants, or
> agreements herein written and contained, and such default shall continue for a

period of 60 days after service of written notice, by certified or registered mail, by [COP] identifying the default and specifying with reasonable particularity the nature and extent thereof, then and in such event this Agreement may be terminated and all of the rights of the [Debtor] shall cease and be wholly determined and [COP] may at once take possession of any or all of the properties herein described.[2]

The Debtor and COP apparently considered that the Default Notice triggered the commencement of the 60-day cure period under the Agreement.

Aquila considered the Agreement to be a valuable asset from which it could collect its judgment and was concerned that the Debtor might attempt to transfer its assets or terminate the Agreement to prevent Aquila from executing and recovering its judgment. At Aquila's request, on December 19, 2007, the USDC entered a Supplemental Order in Aid of Enforcement of Judgment (Supplemental Order) in support of Aquila's $24 million judgment. The Supplemental Order precludes the Debtor from taking "any action that may result in the termination of [the Agreement]."

The Supplemental Order was forwarded to Carl Kingston, who was the Debtor's attorney in the USDC litigation. Carl Kingston was the registered agent for the Debtor and COP. He is also Joe Kingston's cousin.[3] During the latter part of 2007 and into early 2008, Carl Kingston had several meetings with Reynolds about the status of the Agreement and COP's Default Notice.

---

[2]        The Agreement was modified in 2000, but the amendment did not impact this provision of the Agreement.

[3]        Carl Kingston is a member of the Davis County Cooperative Society, Inc. The Board of Directors of that entity are Wendell Owen, Marvin Kingston, John Brown, John Gustafson and Bill Stoddard. Paul Kingston is the Trustee in Trust. Carl Kingston indicated that this position is akin to a Chief Executive Officer. The Debtor's Statement of Financial Affairs shows that John Gustafson also acted as the Debtor's vice president.

He also was in contact with Paul Kingston, one of the Debtor's shareholders, regarding the status of the Agreement and the delinquent royalty payments.[4]

On January 3, 2008, Joe Kingston on behalf of COP sent a letter to the Debtor that provided: "You are hereby notified that as per the terms of the [Agreement] between [COP] and [the Debtor], the [Agreement] will be canceled at the end of the notice period unless the default is cured prior to the end of the 60 day notice period." Sixty days after service of the Default Notice was January 8, 2008. In response to this letter, Reynolds contacted COP to seek a resolution by which the Debtor could avoid termination of the Agreement. Joe Kingston on behalf of COP then sent letters dated January 5, 2008 and January 6, 2008 to Reynolds in which COP sets forth lists of terms that the Debtor would have to comply with in order to continue mining. Both letters required the Debtor to acknowledge that the Agreement would terminate at the close of business on January 8, 2008, and that the Debtor would have no more rights, title, claim or interest under the Agreement. In spite of the Supplemental Order that precluded the Debtor from taking any action that might result in the termination of the Agreement, and the fact that the default period had yet to expire, Reynolds agreed to the terms of these letters. COP and the Debtor then purported to enter into a new Coal Operating Agreement on January 6, 2008 (New Coal Operating Agreement) under which the Debtor would continue to have the right to mine coal at the Bear Canyon Mine.

---

[4] There was testimony that Rachel Young, Paul Kingston, and Joe Kingston are all shareholders in COP, although Rachel Young testified that she is no longer a shareholder.

## The Involuntary Filing and Sale

On January 8, 2008, prior to the close of business, Aquila and other petitioning creditors filed an involuntary bankruptcy petition against the Debtor. After this date, the Debtor continued to operate the Bear Canyon Mine under § 303(f) of the Bankruptcy Code. The Debtor maintains that its authorization to conduct mining operations arose under the New Coal Operating Agreement, not under the Agreement. On May 9, 2008, the Debtor received another letter (May 9th Letter) from Joe Kingston on behalf of COP reminding Reynolds that the Agreement had been terminated, asserting that the Debtor had failed to meet the conditions to accept the New Coal Operating Agreement, and notifying the Debtor that unless all terms of acceptance were met by June 5, 2008 the Debtor must vacate the Bear Canyon Mine by July 5, 2008. It was shortly after receipt of the May 9th Letter that Reynolds began contemplating a sale of the Debtor's assets to a third party.

Reynolds testified that by May 2008, the Debtor was unable to meet its contractual and payroll obligations as well as payments to many of its trade creditors.[5] Reynolds, therefore, decided that he would attempt to sell the Debtor's assets and rights to the Bear Canyon Mine. Reynolds testified that he looked into financing and investment options before attempting to sell the Debtor's assets, but that no party was interested based on the commencement of the involuntary case against the Debtor. As a result, Reynolds contacted Elliot Finley (Finley), the president of Hiawatha Coal Company, Inc. (Hiawatha), in late May 2008. Hiawatha, which occupied a mine permit area adjacent to the Bear Canyon Mine, had previously mined coal from

---

[5]    It is unclear, however, if that circumstance occurred because the Debtor continued to pay pre rather than postpetition debt, because the Debtor made payments to COP under the New Coal Operating Agreement rather than the Agreement, or because of adverse operational circumstances.

above-ground slurry residue, but did not begin underground coal mining until June 2008.  Finley,

who worked in computer programming and network design before June 2008, had worked at one

time as a miner for the Debtor, but had not been employed in a management level position and

had no longwall mining experience.  Finley's brother Nate, who is Hiawatha's vice president, did

not work full time for Hiawatha and maintained outside employment before June 2008.  Mark

Reynolds, Charles Reynolds' brother and Hiawatha's mining engineer, worked as a compliance

officer for the Debtor and now performs that function for Hiawatha.  Prior to June 2008,

Hiawatha contracted with the Debtor to do its compliance work.  The Finleys and the Reynolds

are all members of the Davis County Cooperative Society, Inc.

Reynolds testified that after his initial contact with Finley, he contacted Joe Kingston on

behalf of COP to determine if COP would be amenable to the sale of the Debtor's assets to

Hiawatha.  Finley, Reynolds, Paul Toscano (bankruptcy counsel for the Debtor) (Toscano), and

Carl Kingston gave inconsistent testimony about their respective involvement in the negotiation,

preparation, and execution of the Purchase and Sale Agreement between the Debtor and

Hiawatha (Sale Agreement).  For example, according to Reynolds, his involvement in the

negotiations was limited to setting up meetings and coordinating things between Finley and Joe

Kingston.  Both Carl Kingston and Finley recalled that Reynolds had more involvement in the

negotiations and preparation of the Sale Agreement than Reynolds admitted to while testifying.

Carl Kingston's testimony shows that he drafted the Sale Agreement, but was taking drafting

suggestions from others including Paul Kingston.  Carl Kingston also acknowledged that no

attorney represented Hiawatha in negotiating the sale.

Toscano testified that he counseled the Debtor to conduct an arms' length transaction when it decided to sell its assets.[6]  It is clear that Toscano's admonition to the Debtor was not followed.  For example, the Sale Agreement contemplated a sale with no cash consideration but instead the alleged assumption of secured debts owed to various entities including World Enterprises, ABM, Inc., and Security Funding, Inc. that have familial ties to the shareholders and officers of Debtor, COP, and Hiawatha.[7]  The Debtor also contemplated a sale to an entity whose president (Finley) had no managerial experience in underground mining and was not experienced in longwall mining.

There was also inconsistent testimony regarding the Debtor's alleged voluntary relinquishment of its coal mining leases.  Reynolds testified that the Debtor voluntarily relinquished its interest in any coal mining lease it had with COP so that COP could enter into a new coal mining lease with Hiawatha and that this decision was discussed at a meeting where Toscano was present.  The decision was purportedly memorialized in a letter Reynolds sent to COP on June 23, 2008.  Toscano and Carl Kingston both testified that they did not see a copy of this letter until it was faxed to them on or about July 8, 2008.  And despite being counsel to the Debtor, Toscano never recalled a meeting where this voluntary relinquishment was discussed.

The testimony explaining the execution of the Sale Agreement is sketchy at best.  The Sale Agreement and Bill of Sale bearing a date of June 24, 2008, was signed by Finley for Hiawatha

---

[6]       A review of the Debtor's Corporate Ownership Statement reveals that Paul Kingston, Rachel Young , and John Gustafson are shareholders of the Debtor.  Paul Kingston is also a shareholder of COP.

[7]       Finley testified that Hiawatha is owned by its shareholders.  Some of those shareholders are Finley, Paul Kingston, and Earl Johnson.  World Enterprises employs Rachel Young and she also acts as its Secretary Treasurer.  She services notes for ABM, Inc. and also does at least enough work for Security Funding, Inc. that this entity authorized her to file a proof of claim on its behalf.

and Reynolds for the Debtor.  It is unclear when or where the signing of the documents took

place because it was not at Toscano's office as indicated in the Sale Agreement.  Section 1.02 of

the Sale Agreement titled "Proprietary Information, Permits, Good Will Improvement and

Intangibles" states that the Debtor sells to Hiawatha "[a]ll proprietary information permits and

intangibles, including but not limited to trade marks, trade names, copyrights and othr [sic]

intellectual property, water rights and agreements, rights of way, permits, customer lists . . . . The

transfer of assets listed in this paragraph shall include but not be limited to the permits listed on

Exhibit 'B' attached hereto and will be subject to any required approvals of third parties."  The

permit by which the Debtor is authorized by the Utah State Division of Oil, Gas and Mining

(DOGM) to conduct mining operations is included in Exhibit B to the Sale Agreement.

When or if the sale was actually consummated is difficult to determine.  After the end of

June 2008, the majority of the Debtor's employees went to work for Hiawatha including Charles

and Mark Reynolds.  The Bear Canyon Mine continued to be mined using the equipment

previously used by the Debtor (and which are the subject of some of the other executory contracts

and leases at issue in the Extension Motion) employing the longwall mining method.  The account

name for at least one of the vendors continued to show the Debtor's name.  Hiawatha continued

to *use the* water *that had been the subject of written and oral* contracts between the Debtor and

Rachel Young (Joe and Paul Kingston's sister) and the Debtor and Joe Kingston.  The Debtor's

on-road vehicles were never retitled to Hiawatha.  Hiawatha allegedly paid the purchase price of

$14,075,007.69 through an assumption of the Debtor's secured debt owed to World Enterprises,

Security Funding, Inc., and ABM, Inc. and Finley eventually executed assumption agreements

with these three entities.  However, Hiawatha did not pay any amounts to these three entities and

in December 2008 Rachel Young  filed proofs of claim against this estate on behalf of World

Enterprises, Security Funding, Inc. and ABM, Inc. for both the secured amounts Hiawatha

assumed and unsecured amounts.   Although the Sale Agreement provided for Hiawatha's

assumption of the Debtor's debt as consideration for the sale, Rachel Young testified that

Hiawatha's assumption of the Debtor's secured obligations was not intended to relieve the Debtor

of its secured debts.   Instead, the parties intended both the Debtor and Hiawatha to remain liable

for those secured claims after the sale.   The Sale Agreement did not include an assumption of the

judgment that the Debtor owed to Aquila.

Again, when and if the sale was actually consummated is difficult to determine, but what is

clear from the evidence presented is that some of the sale documentation was not completed and

executed in late June 2008, including the documentation necessary to cause various governmental

authorities, including DOGM, to transfer the Debtor's right to mine coal to Hiawatha.

### The Preservation Order

Shortly after June 24, 2008, Aquila filed the Motion of Aquila, Inc. for Order Preserving

and Protecting Assets of Bankruptcy Estate and Requesting Notice and Hearing in Connection

With Debtor's Purported Sale of Substantially All Operating Assets to a Related Entity

(Preservation Motion).   After an evidentiary hearing, this Court entered its Memorandum

Decision Denying in Part and Granting in Part Motion of Aquila, Inc. for Order Preserving and

Protecting Assets of Bankruptcy Estate and Requesting Notice and Hearing in Connection With

Debtor's Purported Sale of Substantially All Operating Assets to a Related Entity and an

accompanying Order (collectively "Preservation Order").   In its Preservation Order, the Court

ordered,

> that from this point forward any use, transfer, or disposition of any of the Debtor's
> assets outside the ordinary course of the Debtor's business is subject to the
> provisions of § 363 of the Bankruptcy Code.  If the Debtor wants to transfer, sell,

or seek approval of the transfer or sale of its assets to Hiawatha or any other party
outside the ordinary course of the Debtor's business, a motion must be filed, set
for hearing, and properly noticed out to all parties pursuant to the Bankruptcy
Code and Bankruptcy Rules.  This order applies to any portion of the Sale
Agreement or any other post-petition transfer that has not yet been consummated
including the approval of the sale by various governmental agencies and regulatory
agencies or commissions.

Since the issuance of the Preservation Order, the parties have attempted to consummate

the sale.  By document with an effective date of October 30, 2008, Reynolds and Finley executed

a Transfer and Assumption Agreement with John Deere related to a John Deere 320 Skid Steer

Loader used at the Bear Canyon Mine.  The Debtor and Hiawatha have attempted to persuade

DOGM to reissue the permit to mine the Bear Canyon Mine, and to transfer the Debtor's

reclamation bond into Hiawatha's name.

### Trustee's Actions

Once appointed, the Trustee began investigating assets that may be available for

distribution to creditors, including recovery of transferred assets under a variety of legal theories.

The Debtor has complicated this process by filing an incomplete Statement of Financial Affairs

and Schedules, and by filing late its list of creditors.  The Trustee has spent much of his early

months coming up to speed on the numerous motions filed by various parties.  Additionally,

access to the Debtor's books and records, including production reports, has been complicated by

restricted access to the Bear Canyon Mine.  But the Trustee has retained Carl Pollastro

(Pollastro) and Michael Weigand, through Norwest Corporation, to provide expert advice and

opinions regarding the characteristics of the Bear Canyon Mine, its coal reserves, operating

conditions and equipment, and the marketability of its assets.

After visiting the mine, reviewing the Debtor's records, other state and federal agency

information and general statistics, and interviewing various individuals, the experts issued a report

in which they expressed concern about the Debtor's and Hiawatha's ability to effectively manage

the operation of the mine, to comply with the numerous safety and regulatory requirements, and

to cost effectively extract the coal using the longwall mining method.  Pollastro encountered some

resistance from the former employees of the Debtor when trying to investigate the Bear Canyon

Mine.  Initially, he and the Trustee were denied access to the mine without a court order.

Norwest requested information about historical costs and production, coal quality, and other data

from the Debtor's former employees.  The former employees initially denied him access to the

Debtor's computers and records and delayed the production of the data.  When the data was

provided, it was incomplete and did not provide the level of detail requested within a time frame

to be useful in the expert report.  Despite these road blocks, Weingand and Pollastro were able to

reach the following conclusions:

- •    The total amount of coal reserves are estimated to be between 16 to 25 million tons of coal based on current data.
- •    The total value of the in-place coal reserves at Bear Canyon Mine range between $4 million and $20 million.
- •    Estimated coal production costs for the Bear Canyon Mine are between $30-$40 per ton, F.O.B. rail.
- •    The market value of the coal ranges from $50-$75 per ton, F.O.B. rail on the spot market and from $27-$40 per ton, F.O.B. rail on potential long term contracts.
- •    The close proximity of the Bear Canyon Mine to coal users and changes in the coal market will invite offers to purchase the mine.
- •    Cessation of longwall mining for a period of time will not compromise the integrity of the mining equipment.

Pollastro also called into question the competence, safety record, and skill level of the

Debtor and those currently operating the Bear Canyon Mine.  Among other things, Pollastro

questioned the following: the Debtor's decision to change its mining method from continuous

mining to longwall mining; the Debtor's questionable safety record; its lack of longwall mining

expertise; and its productivity levels.  Both Reynolds and Finley disputed some of Pollastro's

conclusions Specifically, Reynolds, who is very familiar with the sandstone *channels* in the mine

and the access available to mine the Hiawatha Seam, challenged Pollastro's estimates of the

*economics* of accessing all of the Bear Canyon Mine reserve and the potential damages to the

longwall equipment if mining is temporarily shut down.

In connection with his investigation, Pollastro contacted potential purchasers to gauge

interest.  Some of the entities contacted were Arch Coal, CONSOL Energy and various

investment groups.  In sum, Pollastro concluded that the right to mine the Bear Canyon Mine is a

valuable asset that could be successfully marketed and sold.  The Court finds, based upon the

credibility of the witnesses, that Pollastro's conclusions are credible.

The Trustee has yet to conclude his investigation into or recovery of the Debtor's assets,

and on January 5, 2009 filed the Extension Motion seeking the maximum extension to assume or

reject the Agreement and an additional extension to assume or reject the other executory

contracts or until June 11, 2009.  By an order effective January 12, 2009 and entered February 2,

2009, the Court extended the time for the Trustee to assume or reject the executory contracts or

unexpired leases of personal property until March 13, 2009.  COP has objected to the Trustee's

Extension Motion as it relates to the lease of the Bear Canyon Mine and filed its Assumption

Motion seeking immediate assumption or rejection of any unexpired lease between COP and the

Debtor.

**Current Operation of the Bear Canyon Mine**

Since the entry of the Preservation Order, Hiawatha has been operating the Bear Canyon

Mine, but Reynolds testified that he has grave concerns regarding the integrity of the mine and

potential damage to the longwall mining equipment if mining stops for even a short period of

time.  Reynolds also has concerns about the ability of the Bear Canyon Mine to continue

operations without additional capital and equipment.  Finley testified that despite his efforts to

rehabilitate the mine operation, the mine operated at a loss from June 24, 2008 until January or

February 2009.  At that time,  DOGM issued a cessation order instructing Hiawatha to stop all

continuous mining (including development of future longwall panels) and requiring all longwall

mining to cease after the current panel is completed.  The cessation order was issued because the

Debtor's DOGM mining permit has not been transferred to Hiawatha yet.  According to Finley,

Hiawatha must post a reclamation bond before DOGM will transfer the mining permit.[8]  Finley

and Reynolds testified that the Debtor currently has a bond with Lyndon Property Insurance

Company (Cumberland/Lyndon) (which it is required to maintain as per the Sale Agreement)[9] that

is secured by a certificate of deposit or a letter of credit with U.S. Bank.  It is Finley's

understanding that Cumberland/Lyndon is only waiting for this Court's approval to transfer the

bond to Hiawatha and, once that is accomplished, DOGM will lift the cessation order and issue

the mining permit to Hiawatha.  Reynolds testified that Hiawatha did not have sufficient resources

to obtain its own bond at the time of the sale, but if the cessation order were lifted, it may be able

to obtain its own bond because after terminating continuous mining operations, the mine has

begun to be profitable.  But Reynolds also indicated that the operation needs substantial additional

capital and equipment to become profitable as a longwall operation.

　　　　Since the filing of the Extension Motion, various individuals associated with the Bear

Canyon Mine and with interests in the surrounding area and its resources have indicated that they

---

[8]　　　Finley also testified that Hiawatha may be appealing DOGM's cessation order through its
administrative channels.

[9]　　　Section 1.05 of the Sale Agreement states: "[Debtor] agrees to maintain the reclamation
bonds and its workers compensation insurance, in order for [Hiawatha] to complete the assumption or
replacement of [Debtor's] bonds and insurance."

are not interested in working with or entering into contracts with any company other than

Hiawatha.  For instance, Joe Kingston and Rachel Young, who are brother and sister, both

testified that they would be unwilling to allow any other operator to lease their Huntington

Cleveland Irrigation Company water shares in order to continue operating the Bear Canyon Mine.

Neither individual gave a reason as to why they would not allow another entity to lease these

shares.  Joe Kingston did admit that other individuals owned shares and that these shares are sold

on the market from time to time.  Hiawatha itself (through Reynolds) maintains that it will not

allow any other company to access the Bear Canyon Mine through its portal or access point.

　　　Joe Kingston also testified that he has special trust and confidence in those individuals

currently employed by Hiawatha because many of those individuals worked for the Debtor prior

to the sale in June 2008, he has observed them over the years and finds them to be trustworthy,

responsive, and competent, and has had few if any problems with the Debtor and its former

management since 1997.  This testimony stands in stark contrast to the numerous letters COP

issued during 2007 and early 2008 informing the Debtor of its failure to fulfill its requirements and

obligations to COP under the Agreement.  Much of Joe Kingston's testimony focused on the trust

and confidence he places in the employees and managers who are currently at the Bear Canyon

Mine.  Joe Kingston testified that his willingness to enter into a new coal mining lease with

Hiawatha was based on the fact that it hired many of these men.  When pressed for the names of

these men in whom he places such trust and confidence, Joe Kingston listed the following

individuals: Reynolds (President of the Debtor and now mine manager for Hiawatha), Finley

(current President of Hiawatha), Ken *Defa* (safety), and Kevin Peterson (mine operations and

fabrication).

Joe Kingston maintains that the Agreement was only executed in 1997 because of the special trust and confidence he had in these and other unnamed men, but there was little evidence that Joe Kingston actually relied on the special skill or knowledge of those employed by the Debtor in 1997 when the Agreement was executed, or that the parties contemplated a close association between them in the actual operation of the Bear Canyon Mine.  This testimony is also belied by paragraph 10 of the Agreement which states that "[e]ach obligation hereunder shall extend to, and be binding upon, and every benefit hereof shall insure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto."  In total, the Court found Joe Kingston's testimony on this issue to be self-serving and less than credible.

From the above findings of fact, the Court makes the following conclusions of law.

### III.  ASSUMPTION MOTION

In the Assumption Motion, COP asks this Court first to determine whether the Agreement is an unexpired lease that the Trustee can assume or reject under § 365.  If the Court finds that the Agreement is an unexpired lease, then COP urges the Court to immediately require the Trustee to assume or reject the Agreement.

Section 365 authorizes the Trustee to assume or reject unexpired leases of the Debtor. An unexpired lease becomes property of the estate under § 541, if it has not terminated prior to a bankruptcy petition being filed.[10]  A trustee has this authority even if the debtor has defaulted

---

[10]      *Motorcycle Excellence Group, Inc. v. BMW of N. Am. LLC (In re Motorcycle Excellence Group, Inc.),* 365 B.R. 370, 377 (Bankr. E.D.N.Y. 2006) (finding that unexpired franchisee lease is property of the estate).  Section 541 states:
    (a) The commencement of a case ... creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
      (1) ... [A]ll legal and equitable interests of the debtor in property as of the commencement of the case.

under the terms of the unexpired lease prior to a bankruptcy petition being filed.[11]  If, however,

the unexpired lease is terminated prior to filing, then there is nothing for the debtor or the

subsequent trustee to assume.[12]

### A.    Statutory Exclusion

COP first asserts that the Agreement is not assumable because it falls within the

parameters of § 365(c)(1)(A), constitutes a personal services contract, and is therefore excluded

from the kind of executory contracts that a trustee may assume.  A personal services contract is

one "which is personal in nature, where the personal needs, characteristics or personality of the

obligee are dominant factors in the reason for contracting."[13]  Joe Kingston testified that he has

particular confidence in Reynolds, Finley and various other individuals who conducted and are

now mining coal at the Bear Canyon Mine because they have done a good job, they are willing to

work with other surface users, he has known them for years, and he would not have such

confidence in any other operators.  Joe Kingston stated that the personal characteristics of the

workers were dominant factors in COP's reasons for entering into the Agreement.  But the

balance of the evidence on this point suggests otherwise.  First, the Court notes that the

Agreement was entered into in 1997 over a decade before the involuntary petition was filed.  *Bill*

Stoddard, who was the Debtor's president at the time, is no longer employed by the Debtor or

---

[11]     *See* § 365(b).

[12]     *Moody v. Amoco Oil Co. (In re Moody),* 734 F.2d 1200, 1212 (7th Cir. 1984).

[13]     *Clark v. Shelton*, 584 P.2d 875, 877 (Utah 1978).  In determining whether a contract is
one for personal services, the Court looks to applicable state law, and in the absence of any ambiguity, the
Court looks first within the four corners of the document to determine its meaning. *See Flying J Inc. v.
Comdata Network, Inc.*, 405 F.3d 821, 831 (10th Cir. 2005) (noting that "Utah law is unsettled on the
issue whether the court may go beyond the four corners of the contract to determine whether the contract is
ambiguous").

Hiawatha.  Joe Kingston was able to name three or four individuals in whom he has specific trust

and confidence and who still work at the Bear Canyon Mine.  But other than naming these

individuals, COP has not demonstrated persons or duties named under the Agreement that are so

personal in nature that the characteristics or personality of the coal mine operator could be

deemed a dominant factor in the reasons for entering into the Agreement.  Second, the Agreement

bears no resemblance to a personal services contract and, in fact, contains a provision that allows

the rights and obligations of the Agreement to be assigned.  Joe Kingston's self-serving and

unpersuasive testimony on this issue is unconvincing to this Court.

In support of its argument, COP refers to the case of *Powerine Co. v. Russel's Inc.*[14]  In

that case, the court found that a gasoline service station lease was a personal services contract

because it was executed on a written form where the provisions regarding the assignment of the

lease and subleasing had been stricken out.[15]  The court found that this demonstrated the parties'

intent to enter into a personal services contract that was not assignable.[16]  The facts and

circumstances of *Powerine* are distinguishable from this case.  Here, the contract clearly provides

for the assignment of the rights and obligations under the Agreement.  There is simply no

indication, but for Joe Kingston's sketchy testimony, that the original parties to the Agreement

intended it to be a personal services contract.

COP also asserts that the Agreement cannot be assumed because it falls within §365(c)(2)

and is a contract to make a loan, or extend other debt financing or financial accommodations to

---

[14]     135 P.2d 906 (Utah 1943).

[15]     *Id.* at 913-14.

[16]     *Id.* at 914.

the Debtor.  No evidence has been presented to support COP's claim that the Agreement is a contract to make a loan or extend some other financial accommodation to the Debtor.[17]  *The 2000 amendment to the Agreement simply deferred a portion of the royalties owed by the Debtor to COP for a period of time.  The 2000 amendment was not the principal purpose of the Agreement, which was to allow the Debtor to mine coal from the Bear Canyon Mine and to pay COP a royalty.  The 2000 amendment was simply an extension of the sequential royalty payments and does not constitute debt financing or financial accommodation as set forth in §365(c)(2).[18]*

The Court concludes that the Agreement is a lease of nonresidential real property.  It is not statutorily excluded from assumption by the Trustee as a personal services contract or a contract to make a loan.  Therefore, the Agreement falls within the purview of § 365.

### B.      Prepetition Termination

Under § 541(b)(2) and § 365, the trustee does not have the authority to assume an unexpired nonresidential lease that terminated prior to the filing of the bankruptcy petition, and such a lease does not become property of the estate.[19]  "However, the termination must be complete and not subject to reversal, either under the terms of the contract or under state law."[20]

---

[17]      Under § 365(c), the Trustee may not assume an unexpired lease "whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if . . . (2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor. . . ."

[18]      *In re United Airlines, Inc.*, 368 F.3d 720, 724 (7th Cir. 2004) (analyzing § 365(c)(2) and its application).  *See also In re Ernie Haire Ford,Inc.,* __ B.R. __, No. 8:08-bk-18672-MGW, 2009 WL 931528, at *3 (Bankr. M.D. Fla. April 8, 2009).

[19]      *In re Memphis-Friday's Ass'n,* 88 B.R. 830, 840 (Bankr. W.D. Tenn. 1988).

[20]      *Moody*, 734 F.2d at 1212 (internal citations omitted).

In determining whether an unexpired lease has terminated prepetition, and the extent of a debtor's interest in property as of the petition date, courts must refer to state law.[21]  Consequently, this Court must look to the Agreement and Utah law to make this determination.  Under Utah law, the initial review of a contract begins with a court examining the contract itself to ascertain the intent of the parties.[22]  COP sent the Default Notice to the Debtor (at the earliest) on November 9, 2007 informing the Debtor that it was in default.  The Default Notice provided the Debtor with specific actions that the Debtor needed to take to cure that default.  Under paragraph 9 of the Agreement, the Debtor had 60 days after the Default Notice was given to cure the defaults or "this Agreement *may* be terminated and all of the rights of the [Debtor] shall cease and be wholly determined and COP *may* at once take possession of any or all of the properties herein described."[23]  Sixty days from November 9, 2007 (Friday) was January 8, 2008 (Tuesday).  The cure period did not expire until close of business on January 8, 2008.  The involuntary petition was filed on January 8, 2008 at 3:36 p.m. prevailing MST.  The termination of the Agreement was not complete under its default provision when the involuntary petition was filed.  As such, any of the Debtor's legal or equitable interests in the Agreement became property of the estate under § 541(a).

---

[21]     *Motorcycle Excellence,* 365 B.R. at 378.

[22]     *See Gillmor v. Macy,* 121 P.3d 57, 69-70 (Utah App. 2005) (stating that "[o]ur rules of contract interpretation require, [i]f the language within the four corners of the contract is unambiguous, that courts first look to the four corners of the agreement to determine the intentions of the parties ... from the plain meaning of the contractual language.  However, Utah law does not strictly require courts to only view the terms of a contract within its *four corners*, according to their *plain meaning*, when making the determination of whether there is an ambiguity in a contract") (internal citations and quotations omitted) (emphasis in original).

[23]     Emphasis added.

COP attempts to undermine this conclusion by producing various January 2008 letters that purport to cancel and/or renegotiate the terms of the Agreement and provide for its automatic termination effective January 9, 2008.  These prepetition actions were, however, prohibited by the December 19, 2007 Supplemental Order.  The Supplemental Order prohibited the Debtor from taking any "actions that may result in the termination of its [Agreement] with [COP]. . ."  Such activities included the Debtor's attempts to enter into the New Coal Lease Agreement with COP and Reynolds' attempts to terminate the Agreement before the expiration of the 60-day cure period.  When asked about the Supplemental Order and its effect, Reynolds stated that although he was aware of the Supplemental Order, he did not consider it or its impact on his negotiations with COP in early January 2008.  Reynolds went on to admit that the Supplemental Order did prohibit him from terminating the Agreement.

At the time a bankruptcy petition is filed, the estate includes any rights under a contract that a debtor has —  no more, no less.[24]  Here, the Debtor still had all of the rights afforded to it under the Agreement when the petition was filed because the Agreement had not automatically terminated and any act to prematurely terminate the lease violated the Supplemental Order.  As a result, the Agreement and any rights thereunder became property of the estate.

C.      Postpetition Termination

COP maintains that even if the Agreement had not terminated pre-petition, it is not assumable by the Trustee for other reasons.  First, COP argues that the automatic stay did not toll the running of the 60-day cure period and, as a result, the Agreement terminated at the end of business on January 8, 2009.  But a review of the default provision of the Agreement does not

---

[24]      *Moody*, 734 F.2d at 1213.

support this argument.  The Agreement clearly states that COP *may* terminate the Agreement if

the Debtor fails to cure within the 60-day cure period.  Although the Agreement does not include

what specific action is needed, COP must take some action in order to exercise its discretionary

authority at the end of the 60-day period to terminate the Agreement.  But by the time the 60-day

cure period had run (the end of business on January 8, 2008), the involuntary petition had been

filed and the automatic stay prohibited COP (or any other creditor) from seeking termination of

the Agreement without first getting relief from the stay.[25]

The case law cited by COP in support of this argument is distinguishable from this case.[26]

Admittedly, the automatic stay does not stop the termination of a contract that automatically

expires by its own terms.[27]  For example, in *Moody* the dealership agreements executed between

the debtors and the creditor were subject to automatic termination 90 days after notice was

provided to the debtors.[28]  The 90-day termination notices gave the debtors no right to cure once

the notices were issued.[29]  The court concluded that the automatic stay did not give the debtors

any greater rights than those granted to them in the contract, and at the time the bankruptcy

petition was filed, those contract rights were limited to the remaining portion of the 90-day

---

[25]      Section 362(a)(3).

[26]      In support of its motion, COP has relied or at least cited in support the following cases:
*Trigg v. United States of America Dept. Of Interior,* 630 F.2d 1370 (10th Cir. 1980);  *Moody,* 735 F.2d
1200; *In re Policy Realty Corp.,* 242 B.R. 121 (S.D.N.Y. 1999); *Memphis-Friday's Ass'n,* 88 B.R. 830;
*In re West Pine Construction Co.,* 80 B.R. 315 (Bankr. E.D. Pa. 1987);  *In re Compass Development,
Inc.,* 55 B.R. 260 (Bankr. D.N.J. 1985).  Each of these cases dealt with contracts that were subject to
automatic termination, were not curable, or that expired under their stated terms.  They did not includes
leases that were curable at the time the bankruptcy petitions were filed.

[27]      *Moody,* 734 F.2d at 1213.

[28]      *Id.*

[29]      *Id.* at 1213.

termination period.  The court stated that "[t]he automatic stay does not toll the mere running of

time under a contract, and thus it does not prevent automatic termination of the contract."[30]

Ultimately, the court held that the debtors had no right to assume or reject the dealership

agreements under § 365 because § 362 did not toll the automatic termination of the dealership

agreements.[31]  Unlike the dealership agreements in *Moody*, termination of the Agreement was not

*automatic* at the expiration of the 60-day cure period.[32]  COP still had to take steps to terminate

the Agreement once the 60-day cure period had expired and it was precluded from doing so by

the automatic stay.

Second, COP maintains that under § 365(c)(3) the Trustee cannot assume the Agreement

because it "has been terminated under applicable nonbankruptcy law prior to the order for relief."

COP is accurate in pointing out that the order for relief was not entered in this case until

September 26, 2008.  It is not correct, however, in its assertions that the Debtor voluntarily

relinquished the Agreement before that date or that the Agreement expired by its own terms post-

petition.  As stated before, the later argument fails because the Agreement did not provide for

automatic termination at the end of the 60-day cure period.  The former argument fails because

the Court questions the timing and efficacy of the Debtor's purported voluntary relinquishment

---

[30]     *Id.*

[31]     *Id.*   The second type of contract in the *Moody* case were jobbership agreements.  The jobbership agreements were unlike the dealership agreements because the jobbership termination notices gave the debtors 15 days to cure the articulated default.  The debtors in *Moody* filed their bankruptcy petition before the 15-day cure period had expired.  In contrast to the dealership agreements, the *Moody* court allowed the debtors to assume or reject various jobbership agreements under § 365 because "[a]t the time debtors filed their petition, the time for cure had not expired.  The contract was still executory . . . [and] [u]nder section 365(a), debtors may still elect to assume the contract."  *Id.* at 1215-16.

[32]     *In re Wills Motor Inc.*, 133 B.R. 297, 301 (Bankr. S.D.N.Y. 1991) (finding that even though there was no further act needed to terminate the lease, the termination was not complete because there was a state court injunction in place that prevented the termination).

based on the evidence presented at the hearings.  If the Debtor voluntarily terminated any coal

operating agreement on June 23, 2008, then why weren't Carl Kingston and Toscano (two of the

attorneys involved at the time) notified of that decision before July 8, 2008, and why didn't

Toscano have any recollection of this issue being discussed at the meetings he was purportedly

attended?  Furthermore, any action by COP to accept the Debtor's alleged voluntary

relinquishment or to exercise dominion or control over the Debtor's assets (including the

Agreement), would be a violation of the automatic stay and, therefore, void and without effect.[33]

The evidence presented simply does not support COP's contention that the Agreement terminated

post-petition.

### D.    Early Assumption or Rejection

The Agreement between the Debtor and COP did not terminate prepetition and any legal

or equitable rights the Debtor had on the date the involuntary petition was filed became property

of the estate.  The Agreement did not terminate postpetition due to the restraining effect of the

automatic stay.  COP does not assert that the Debtor conveyed its rights under the Agreement to

Hiawatha as one of its assets through the sale.  Thus, the Agreement was still in effect between

the Debtor and COP when the order for relief was entered, the Debtor's rights under the

Agreement were not sold postpetition, and under § 365(d)(4), the Trustee has 120 days from the

order for relief to assume or reject the Agreement.

COP requests that the Court require the Trustee to immediately assume or reject the

Agreement.  The bulk of COP's argument focuses on facts allegedly demonstrating that the

Trustee does not have the ability or the legal capacity to assume and/or assign the Agreement.

---

[33]    *Ellis v. Consolidated Diesel Elec. Corp.*, 894 F.2d 371, 372 (10th Cir.1990).

Some of these arguments include lack of sufficient water rights to mine, COP's own disinclination to enter into a lease agreement with anyone other than the Debtor or Hiawatha, and the need for more equipment and further capital infusion to make the project viable. The Court does not find these arguments compelling at this point in the case. Any arguments addressing the ability of the Trustee to assume and assign the Agreement can and will be addressed if and when the Trustee decides to assume the Agreement. The Trustee, through the evidence presented and the testimony of Pollastro, has demonstrated that the right to mine the coal in the Bear Canyon Mine is a valuable asset. There are significant amounts of coal reserves and an active market in which to sell those reserves. COP has failed to demonstrate sufficient grounds that would require the Trustee to immediately assume or reject the Agreement. Consequently, COP's Assumption Motion was denied.

## IV.  EXTENSION MOTION

Under § 365(d)(4) a lease of nonresidential real property is deemed rejected if not assumed or rejected by the earlier of 120 after the entry of the order for relief, or the date a confirmation order is entered in the case. Subsection (B) allows a court to grant trustees a 90-day extension if the request is made prior to expiration of the 120-day period, and if the trustee is able to demonstrate cause for such an extension. Cause under § 365(d) is not a defined term. In examining cause under § 365(d)(4), courts have looked at the following factors that are applicable here: (1) whether the lease is the primary asset; (2) whether amounts due under the lease are being paid; (3) whether there will any potential prejudice to the landlord from noncompensable damages; (4) whether the case is unusually large or complex; and (5) any other factor

demonstrating the lack of a reasonable period of time for the trustee to decide whether to assume or reject.[34]

Several of these factors weigh in favor of allowing the Trustee additional time to decide whether to assume or reject the Agreement and the other executory contracts and leases.  It cannot be denied that the right to mine coal in the Bear Canyon Mine and the equipment used to mine that coal are *potentially* the primary assets of the estate.  There is no articulated harm COP will suffer if the Trustee is given additional time to assume or reject the Agreement.  COP will continue in the exact same position it is now albeit with a potential ever increasing arrearage under the terms of the Agreement.  The initial involuntary nature of this case and the litigation surrounding actions taken during the gap period have made this case complex.  The Trustee has spent much of his early months dealing with his disputed election and trying to get up to speed on various motions to clarify and reconsider rulings as well an numerous other motions and requests made to this Court.  This coupled with the Debtor's dilatory acts of not preparing accurate and timely Schedules, a Statement of Financial Affairs, and creditor lists as well as the Debtor's failure to timely and adequately respond to the Trustee's inquiries also weigh in favor of allowing the Trustee more time to decide whether to assume or rejection the Agreement.  The Trustee has established that cause exists and, therefore, the Court granted the Extension Motion and extended the deadline for the Trustee to assume or reject the Agreement and the other executory contracts included in the Extension Motion to June 11, 2009.

---

[34]   COLLIER ON BANKRUPTCY, ¶ 365.04[3][f] at 365-38 (15th ed. rev. 2007); *see also South Street Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc),* 94 F.3d 755, 761 (2nd Cir. 1996); *In re Beautyco, Inc.,* 307 B.R. 225, 231 (Bankr. N.D. Okla. 2004).

## V.  CONCLUSION

The Agreement between COP and the Debtor and the other executory contracts and leases are important and valuable assets of this estate.  All parties have an interest in allowing the Trustee sufficient time to investigate the estate's options and to formulate a course of action in regard to these contracts.  COP's reasons for requesting early termination of the Agreement are not sufficiently compelling to require this Court to terminate the Trustee's right before the expiration of the 120-day time period articulated in § 365(d)(4).  And the Trustee has presented facts and argument sufficient to establish that there is cause to allow him additional time to determine whether assumption or rejection of the Agreement and the other executory contracts will be beneficial to this estate.  Two separate orders have been issued in addition to this Memorandum Decision.

----------------------------------------END OF DOCUMENT----------------------------------------

_____oooOooo_____

## SERVICE LIST

Service of the foregoing **_AMENDED_ MEMORANDUM DECISION DENYING COP COAL DEVELOPMENT COMPANY'S MOTION TO REQUIRE THE TRUSTEE TO ASSUME OR REJECT LEASE, AND GRANTING TRUSTEE'S MOTION TO EXTEND TIME FOR TRUSTEE TO ASSUME OR REJECT EXECUTORY CONTRACTS OR UNEXPIRED LEASES OF THE DEBTOR** will be will be effected through the Bankruptcy Noticing Center to each party listed below:

C.W. Mining Company
PO Box 65809
Salt Lake City, UT 84165
    *Debtor*

Russell S. Walker
David R. Williams
Woodbury & Kesler
265 East 100 South
Suite 300
Salt Lake City, UT 84111
    *Debtor's Counsel*

Kenneth A. Rushton, Trustee
99 West Main Street
P. O. Box 212
Lehi, UT 84043
    *Chapter 7 Trustee*

Michael N. Zundel
Prince Yeates & Geldzahler
City Centre I, Suite 900
175 East 400 south
Salt Lake City, UT 84111
    *Trustee's Counsel*

Keith A. Kelly
Steven W. Call
Steve Strong
Ray Quinney & Nebeker, P.C.
36 South State St., Suite 1400
P.O. Box 45385
Salt Lake City, UT 84145-0385
    *Counsel for Aquila, Inc.*

Conrad H. Johansen
Tyler Foutz
Olsen Skoubye & Nielson
999 East Murray-Holladay Road
Suite 200
Salt Lake City, UT 84117
    *Counsel for Owell Precast, LLC*

John T. Morgan
US Trustees Office
Ken Garff Bldg.
405 South Main Street
Suite 300
Salt Lake City, Ut 84111

David E. Leta
Snell & Wilmer
15 West South Temple
Suite 1200
Beneficial Tower
Salt Lake City, UT 84101-1547

Opin0548.wpd

April 23, 2009

F. Mark Hansen
F. Mark Hansen, P.C.
431 North 1300 West
Salt Lake City, UT 84116
        *Counsel for Standard Industries, Inc.*
*et al.*

Danny C. Kelly
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT 84111
        *Counsel for Graymont Western US*
*Inc.*

Lon Jenkins
Troy Aramburu
JONES WALDO HOLBROOK &
MCDONOUGH, PC
170 South Main St., Suite 1500
Salt Lake City, UT 84101
        *Counsel for Lyndon Property*
*Insurance Company*

Peter W. Guyon
614 Newhouse Building
The Law Office of Peter W. Guyon, P.C.
10 Exchange Place
Salt lake City, UT 84111
        *Counsel for Hiawatha Coal*
*Company Inc.*