**The below described is SIGNED.**

**Dated: August 06, 2010**   _____



**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH
Central Division

| | |
|---|---|
| In re<br><br>C. W. MINING COMPANY, dba Co-Op<br>Mining Company,<br><br>       Debtor. | Bankruptcy Case No. 08-20105 RKM<br>(Chapter 7)<br><br>**AMENDED FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW IN<br>CONNECTION WITH:<br>TRUSTEE'S MOTION FOR ADDITIONAL<br>FINDINGS ON TRUSTEE'S MOTION<br>REQUESTING AUTHORITY TO ASSUME<br>EXECUTORY CONTRACTS<br>AND<br>MOTION FOR ORDER AUTHORIZING<br>ASSIGNMENT OF EXECUTORY<br>CONTRACTS AND SALE OF MINE<br>ASSETS FREE AND CLEAR OF ALL<br>LIENS, CLAIMS, INTERESTS, AND<br>ENCUMBRANCES PURSUANT TO<br>11 U.S.C. §§ 105, 363 AND 365<br>AND<br>MOTION FOR ORDER REQUIRING<br>REMOVAL FROM MINE SITE PROPERTY<br>OWNED BY THIRD PARTIES<br>AND MOTION FOR DETERMINATION OF<br>OWNERSHIP OF PROPERTY AT THE<br>MINE SITE PURSUANT TO PRIOR<br>ORDER** |

Kenneth A Rushton, Chapter 7 trustee (the "**Trustee**") for C.W. Mining Company, dba

Co-Op Mining Company (the "**Debtor**") on May 3, 2010, filed as Dkt No. 1299 the following

motions (collectively referred to herein as the "**Sale Motion**"):

1.      Trustee's Motion for Additional Findings on Trustee's Motion Requesting Authority to Assume Executory Contracts;

2.      Motion for Order Authorizing Assignment of Executory Contracts and Sale of Mine Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances Pursuant to 11 U.S.C. §§ 105, 363 and 365;

3.      Motion for Order Requiring Removal from Mine Site Property Owned by Third Parties; and

4.      Motion for Determination of Ownership of Property at the Mine Site Pursuant to Prior Order.

Among other things, the Sale Motion requested entry of an order pursuant to 11 U.S.C. §§ 105, 363 and 365 and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") authorizing the Trustee to sell the mine assets of the estate (the "**Estate**"), free and clear of any and all liens, claims, encumbrances, and interests, to Rhino Energy LLC or its designated affiliate ("**Buyer**") pursuant to the terms of that certain "Asset Sale Agreement" with the Buyer dated May 3, 2010 and subsequently amended by a First Amendment dated May 13, 2010 (Exh. TR I-A) and a Second Amendment dated June 2, 2010 (Exh. TR I-B) (collectively, the "**Sale Agreement**") and in connection with the Trustee's assumption and assignment of the Debtor's mine operating agreements with C.O.P. Coal Development Company ("**COP**") and ANR Company, Inc. ("**ANR**") and other related motions.

The Court conducted an evidentiary hearing on the Sale Motion and the Assumption Motion (defined below) on June 10, 11, 22, 23, 24, 29 and 30, with Michael N. Zundel, Richard H. Thornton and James C. Swindler appearing for the Trustee, William F. Dobbs, Jr. and George

B. Hoffman for Rhino Energy, LLC, Elaine A. Monson for Aquila, Inc., Kim R. Wilson and P.

Matthew Cox for COP, Standard Industries, Inc., World Enterprises, Fidelity Funding, Inc.,

Security Funding, Inc., P.P.M.C., Inc. and ABM, Inc., David E. Kingston for ANR and A-Fab

Engineering, Inc., Peter Guyon for Hiawatha Coal Company, Inc. ("**Hiawatha**"), Russell S.

Walker for Charles Reynolds, and Steven Dougherty for Spartan Coal Resources, Inc.

After consideration of the motions, the objections, responses and briefs submitted in

connection therewith and upon the record of the hearing, and all previous findings, conclusions,

orders, evidence and proceedings in this case, including the *Motion for Order Authorizing Sale of*

*Mine Assets and Assignment of Executory Contracts Under 11 U.S.C. §§ 363 and 365* (Dkt No.

999) ("**First Sale Motion**") and the *Trustee's Motion to Assume Coal Operating Agreements and*

*Certain Related Contracts* (Dkt No. 671) ("**Assumption Motion**"); and it appearing that the

relief requested in the *Trustee's motion for additional findings on Trustee's motion requesting*

*authority to assume executory contracts* and *motion for order authorizing assignment or*

*executory contracts and sale of mine assets free and clear of all liens, claims, interest, and*

*encumbrances pursuant to 11 U.S.C. §§ 105, 363 and 365*, and *motion for order requiring*

*removal from mine site property owned by third parties and motion for determination of*

*ownership of property at the mine site pursuant to prior order*, motions is in the best interests of

the Debtor and the Estate and that an Order substantially in the form sought by the Trustee and

Buyer ("**Order**") should be entered contemporaneously herewith; and after due deliberation and

sufficient cause appearing therefore, the Court makes the following findings of fact and conclusions of law:[1]

## Jurisdiction, Final Order, Statutory Predicates

1.     The Court has jurisdiction over this matter and over the property of the Debtor, including the Mine Assets to be sold, transferred or conveyed pursuant to the Sale Agreement, and property of the Estate pursuant to 28 U.S.C. §§ 157 and 1334, including water rights being acquired from Bear Canyon Mining, LLC ("**Bear Canyon**").  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     The Court's prior findings and conclusions entered on February 10, 2010 (Dkt No. 1156) are incorporated herein to the extent applicable. The present motions involve a different and much stronger buyer and a substantially higher purchase price, but the procedural history, assets being sold and the difficult circumstances under which this case has been administered remain essentially the same.[2]

3.     Venue of this case and the motions is properly laid in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory predicates for the relief sought in the motions and the basis for the approvals and authorizations herein are (i) §§ 363 and 365 of the Bankruptcy Code and (ii) Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014.

---

[1]  These Findings of Fact and Conclusions of Law constitute the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 9014 and 7052, and incorporate by reference any oral rulings made on the record during trial.  Any of the findings of fact herein are also deemed, to the extent appropriate, to be conclusions of law and conclusions of law herein are similarly deemed to be findings of fact and shall be equally binding as both.

[2]  With the notable exception that the Trustee has acquired, since the last hearing, water rights necessary to operate the mine which have become part of the sale.

5.      Hiawatha asserts that the Court cannot resolve the issues of what the Trustee may sell because the Court has lost jurisdiction over the matter because Hiawatha has appealed the Court's prior order stating the standard by which ownership of the disputed assets should be determined, i.e. whether they are "improvements" within the meaning of § 550(e). The Court is satisfied, however, that it retains jurisdiction to address the Sale Motion and to interpret and apply its prior orders irrespective of whether an appeal has been taken. *United States v. Revie*, 834 F.2d 1198, 1205 (5th Cir. 1987); *See also, In re Sherman*, 491 F.3d 948, 967 (9th Cir. 2007) (holding that after the timely filing of an appeal, "the bankruptcy court retains jurisdiction over all other matters that it must undertake 'to implement or enforce the judgment or order'").

## I.   FINDINGS OF FACT

### Time Is of the Essence

6.      Time is of the essence in consummating the sale. The Trustee is maintaining the Bear Canyon Mine ("**Mine**") in an idle state at great expense and risk to the bankruptcy Estate. Moreover, in order to comply with the U. S. Bureau of Land Management (the "**BLM**") requirement of continuous mining on the federal coal leases on which the Mine Operating Agreements (defined herein) are based (the "**Federal Coal Leases**"), mining needs to begin as promptly as possible. In order to eliminate the ongoing expense and risk of maintaining the Mine and to maximize the value of the assets that are the subject of the Sale Motion to the Buyer and as modified by the Order (the "**Mine Assets**"), it is essential that the sale of the Mine Assets occur within the time constraints set forth in the Sale Agreement, as the same have been or may be extended by agreement of Buyer. Accordingly, there is cause to dispense with the stays contemplated by Bankruptcy Rules 6004 and 6006.

7.      To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the entry of the Order.

## Notice of the Motions

8.      As evidenced by the certificates of service and evidences of advertising filed with the Court, (i) proper, timely, adequate and sufficient notice of the motions and hearing (including due and proper notice of the sale and assignment of each of the executory contracts and unexpired leases or other agreements to be assumed and assigned under the Sale Agreement to each non-Debtor party under each such agreement or lease and any related cure) have been provided in accordance with §§ 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014; (ii) such notice was good and sufficient and appropriate under the particular circumstances; and (iii) no other or further notice of the motions, the hearing on the motions, the assumption and assignment of the agreements and leases as provided for herein, cure amounts, or of the entry of the Order is necessary or shall be required.

## Compelling Circumstances for Immediate Sale

9.      The Trustee has demonstrated a sufficient basis and the existence of exigent circumstances requiring it to enter into the Sale Agreement, sell the Mine Assets, and assume and/or assign the agreements and contracts provided for herein under §§ 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Trustee's business judgment and are in the best interests of the Debtor, the Estate and their creditors.  The evidence shows that the Trustee made multiple and diligent attempts to locate parties willing to purchase the Mine

Assets.  After undertaking these efforts, a sale of the Mine Assets at this time to Buyer will result in the highest possible purchase price and therefore the greatest benefit to creditors.

## **Good Faith**

10.     The Buyer is a purchaser in good faith, as that term is used in the Bankruptcy Code and court decisions thereunder, and is entitled to the protections of § 363(m) of the Bankruptcy Code.  The Sale Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind, and the sale process was conducted in good faith.  The Buyer has acted in good faith in all respects in connection with this case and the transactions under the Sale Agreement in that, among other things:

a.     The Trustee conducted the sale process and negotiated with the Buyer;

b.     The Buyer recognized that the Trustee was free to negotiate with any other party that expressed interest in purchasing the Mine Assets; and

c.     All payments to be made by the Buyer and other agreements or arrangements entered into by Buyer with the Trustee in connection with the Sale Agreement have been disclosed.

11.     The Buyer is acting in good faith, pursuant to § 363(m) of the Bankruptcy Code, in closing the transactions contemplated by the Sale Agreement.

## **No Collusion**

12.     The Buyer has not violated § 363(n) of the Bankruptcy Code by any action or inaction.  The sale price to be paid by Buyer was not controlled by an agreement among potential purchasers at any auction or other aspect of the sale, bidding or negotiating process.   The transactions under the Sale Agreement and Order may not be avoided, and no damages may be

assessed against the Buyer or any other party under § 363(n) of the Bankruptcy Code or any other

applicable bankruptcy or non-bankruptcy law.

**Marketing Efforts, Bid Procedures and Auction**

13.        The Trustee has used its retained expert, Norwest Corporation ("**Norwest**"), to

solicit potential bidders for the Mine Assets.  In addition, the Trustee complied with the terms of this

Court's *Order Granting Trustee's First Amended Motion to Approve: (1) Bid Procedures in*

*Anticipation of Assumption and Assignment of the Debtor's Operating Agreements with C.O.P.*

*Coal Development Company and ANR, Inc. (2) Sale of Other Estate Assets and (3) Payment of*

*Break-up Fee and (4) Trustee's Amended Motion to Obtain Credit* (incorporating by reference

Exhibits from Dkt No. 953 as amended by Dkt No. 955) (Dkt No. 960) ("**First Procedures**

**Order**") for the solicitation of requests for proposals for the purchase of the Mine Assets.  Since

the failure of the sale contemplated by the First Procedures Order, the Trustee has taken

additional adequate and reasonable steps to remarket the Mine Assets, including giving

additional notice of an opportunity to make higher and better bids in light of Buyer's offer.

14.        Pursuant to this Court's previously entered March 2, 2010 *Order Authorizing Sale*

*of Assets Free and Clear of Liens and Interests Pursuant to 11 U.S.C. § 363 and Authorizing*

*Assumption and Assignment of Unexpired Leases Pursuant to 11 U.S.C. § 365* (Dkt No. 1189)

("**First Sale Order**"), the Court conditionally approved the assumption of certain leases and

agreements under the Assumption Motion and approved a sale of the Mine Assets (including the

leases and agreements) to Bear Canyon.  Upon the failure of Bear Canyon to close under the terms

of the First Sale Order, the Trustee identified other interested parties who expressed an interest in

the Mine Assets.

15.     On June 1, 2010, the Court entered an Order (Dkt No. 1363) ("**Second Procedures Order**"), providing, among other things, for submission to the Trustee of bid deposits by May 14, 2010 and bid packages by May 21, 2010 and authorizing the Trustee to conduct an auction of the Mine Assets on June 2, 2010.  The Second Procedures Order further authorized the Trustee to purchase certain water shares, an approved temporary change application relating thereto and a pending permanent change application related thereto from Bear Canyon and to pay a $300,000.00 administrative fee to Bear Canyon.  Pursuant to the Second Procedures Order, other parties, including Hiawatha, submitted written offers to the Trustee to purchase the Mine Assets.  The Trustee conducted an auction on June 2, 2010, at which the highest bid was submitted by Buyer in the amount of $15 million.  On June 10, 2010, the Court heard evidence regarding objections by Hiawatha and other parties claiming that the Trustee failed to comply with the Second Procedures Order and/or improperly disqualified Hiawatha as a bidder.  At that time the Court made detailed findings of fact and conclusions of law with respect to those issues on the record, which are incorporated herein by reference.[3]  The Trustee has complied in all material respects with the Second Procedures Order and acted and exercised his discretion and business judgment appropriately in conducting the auction and selecting Buyer's bid as the most qualified and beneficial bid for the Mine Assets.

### Highest and Best Offer

16.     The offer of the Buyer, upon the terms and conditions set forth in the Sale Agreement, including the form and total consideration to be realized by the Estate pursuant to the Sale Agreement and Order, (i) is the highest and best offer received by the Trustee; (ii) is fair and

---

[3] Those findings and conclusions are found in the Transcript of this matter for June 10, 2010, at 127-33.

reasonable; (iii) is in the best interests of the Debtor's creditors and Estate; (iv) constitutes full and adequate consideration and reasonably equivalent value for the Mine Assets; and (v) will provide a greater recovery for the Debtor's creditors and other interested parties than would be provided by any other available alternative. The Trustee's determination that the Sale Agreement constitutes the highest and best offer for the Mine Assets constitutes a valid and sound exercise of the Trustee's business judgment.

### No Fraudulent Transfer

17.     The total consideration provided by the Buyer for the Mine Assets is the highest and best offer received by the Trustee, and the Purchase Price[4] constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act; (ii) fair consideration under the Uniform Fraudulent Conveyance Act; and (iii) under any other applicable laws of the United States, any state, territory or possession or the District of Columbia, reasonably equivalent value, fair consideration and fair value for the Mine Assets.

### Validity of Transfer

18.     In its *Findings of Fact and Conclusions of Law Arising from Trial on November 16, 17, 23, and 24, 2009*, in Adversary Proceeding No. 08-02338 (Dkt No. 118), this Court previously ruled that:

> As of the petition date, the Debtor was in sole, exclusive control of all of the property described in both the COP and ANR Operating Agreements with the Debtor. Hiawatha had no interest in any of that same property and has never, since the petition date, had any legal interest in that property on account of any prepetition agreement with either COP or ANR.

---

[4] Capitalized terms not otherwise defined herein shall have the same meanings provided in the Motion.

In accordance with and furtherance of that ruling, the Court finds that the Mine Assets are property of the Estate, and title thereto is vested in the Estate.

19.    The Trustee has full power and authority to execute the Sale Agreement and all other documents contemplated thereby. No consents or approvals, other than Court approval, are required by the Trustee to consummate such transactions.

20.    Notwithstanding any requirement for approval or consent by any person, the transfer of the Mine Assets to the Buyer in compliance with the Order will be a legal, valid and effective transfer of the Mine Assets and, except as may otherwise be provided in the Order, shall vest Buyer with all right, title and interest of the Debtor and the Estate to the Mine Assets free and clear of any and all Encumbrances (as defined herein).  Except as specifically provided in the Order, the Buyer shall not assume or become liable for any Encumbrances relating to the Mine Assets being sold by the Trustee.

**Section 363(f) of the Bankruptcy Code Are Satisfied With Respect to a Free and Clear Sale**

21.    Except as otherwise specifically set forth in the Order, the Mine Assets shall be sold and transferred to Buyer free and clear of any and all interests arising from conditions first existing on or prior to the closing of the transactions ("**Closing**") that are the subject of the Sale Agreement, including claims (as defined in §101(5)) and liens (as defined in §101(37)), any claims based on theories of successor liability, and any interests in the ANR Real Property and/or COP Real Property claimed by Hiawatha (collectively, the "**Encumbrances**").

22.    The transfer of the Mine Assets to the Buyer free and clear of the Encumbrances will not result in any undue burden or prejudice to any holder of any Encumbrances, as all holders of Encumbrances who have come forward at the hearings shall have their Encumbrances

attach to the net proceeds of the sale of the Mine Assets received by the Trustee in the order of their priority, with the same validity, force and effect which they now have as against the Mine Assets and subject to any offsets, claims and defenses the Trustee or other parties may possess with respect thereto.

23.    Except as may otherwise be provided in the Order, the Trustee may sell the Mine Assets free and clear of the Encumbrances because, in each case, one or more of the standards set forth in § 363(f) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances who did not object to the sale of the Sale Motion are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code.  With respect to the holders of Encumbrances who did object to the Sale motion the sale proceeds of the sale of the Mine Assets exceeds the aggregate value of Encumbrances that are not in bone fide dispute as required by § 363(f)(3) and are adequately protected by having their Encumbrances, if any, attach to the proceeds of the sale of the Mine Assets, or the Encumbrances are in bone fide dispute and § 363(f)(4) is applicable.

24.    Specifically, but without limitation, the Court finds that the following Encumbrances are in bona fide dispute for purposes of 11 U.S.C. § 363(f)(4):

　　　　a.    The interest of P.P.M.C., Inc. ("**PPMC**") as to attorneys' fees under such security interests in favor of the Bank of Utah that are now held by PPMC on the "**Bank of Utah Equipment**" shown in Exh. E-1  to the form of Order attached to the Sale Agreement;

　　　　b.    The interest of Emery County, Utah ("**Emery County**") as to 2009 property taxes for the following parcel:

| Parcel No. | Amount | Nominal "Owner" |
| --- | --- | --- |

| 09-0300-0410 | $443,447.31 | Hiawatha Coal Co-Bear Canyon |
| --- | --- | --- |

c.      The interests of ABM, Inc. ("**ABM**"), Fidelity Funding Company ("**Fidelity Funding**"), Security Funding, Inc. ("**Security Funding**"), Standard Industries, Inc. ("**Standard**") and World Enterprises ("**World**") that are purportedly perfected by the following financing statements (the "**2007 Financing Statements**"):

| Date | Filing No. | Secured Party(ies) |
| --- | --- | --- |
| 05/18/2007 | 320212200769 | Security Funding, ABM, World |
| 08/17/2007 | 326395200701 | Security Funding, ABM, World |
| 10/31/2007 | 331350200794 | World, ABM, Security Funding, Fidelity Funding |
| 11/21/2007 | 332771200704 | ABM |
| 11/21/2007 | 332773200700 | Standard |
| 11/21/2007 | 332766200704 | Fidelity Funding |
| 11/21/2007 | 332772200707 | Security Funding |
| 11/21/2007 | 332770200701 | World |

d.      The interests claimed by Security Funding, Standard, World and Fidelity Funding and evidenced by the following real property security interests that encumber all or part of the COP Real Property or the ANR Real Property:

i.      Real Property Security Agreement dated November 14, 2007, signed by C. W. Mining Company and World Enterprises and recorded December 7, 2007 in the office of the Emery County, Utah Recorder as Entry No. 388434;

ii.    Real Property Security Agreement dated November 14, 2007, signed by C. W. Mining Company and Security Funding and recorded December 7, 2007 in the office of the Emery County, Utah Recorder as Entry No. 388435;

iii.    Real Property Security Agreement dated November 14, 2007, signed by C. W. Mining Company and Standard Industries, Inc. and recorded December 7, 2007 in the office of the Emery County, Utah Recorder as Entry No. 388435; and

iv.    Real Property Security Agreement dated effective June 24, 2008, signed by Hiawatha Coal Company, Inc. ("**Hiawatha**") and Fidelity Funding and recorded November 13, 2008 in the office of the Emery County, Utah Recorder as Entry No. 392523.

e.    Any interests of the secured parties shown in the table below under financing statements ("**Hiawatha Financing Statements**") naming Hiawatha as debtor as they relate to the Mine Assets:

| Date | Filing No. | Secured Party(ies) |
| --- | --- | --- |
| 8/30/2008 | 350275200800 | Security Funding |
| 8/30/2008 | 350276200803 | ABM |
| 8/30/2008 | 350277200806 | World |
| 9/29/2008 | 351750200805 | Fidelity Funding |
| 9/29/2008 | 351776200803 | A-Fab |
| 11/10/2008 | 354044200806 | John Deere |
| 1/6/2009 | 356698200904 | Bank of Utah (and/or PPMC as assignee) |

| Date | Filing No. | Secured Party(ies) |
|------|-----------|---------------------|
| 10/12/2009 | 370283200938 | N.W.R. Limited Partnership |
| 10/12/2009 | 370284200939 | Standard |
| 10/30/2009 | 371136200941 | M.B.S.C. LLC |
| 10/30/2009 | 371144200941 | ABM |
| 10/30/2009 | 371145200942 | World |
| 10/30/2009 | 371146200943 | World |
| 10/30/2009 | 371147200944 | N.W.R. Limited Partnership |

    f.   Any lessor's lien claimed under Utah Code Annotated §38-3-1, et seq. that is claimed for rents due prior to the Closing date either by COP under the COP Mine Operating Agreement or by ANR under the ANR Mine Operating Agreement.

25.    Any interest asserted by Charles Reynolds or his dependents in the scale house is being dealt with separately in Adversary Proceeding No. 09-02798.

**Assumption of the Mine Operating Agreements**

26.    Assumption of the Coal Operating Agreement between the Debtor and COP (the "**COP Mine Operating Agreement**") and the Coal Operating Agreement between the Debtor and ANR (the "**ANR Mine Operating Agreement**", together with the COP Mine Operating Agreement collectively referred to herein as the "**Mine Operating Agreements**") and assignment thereof to the Buyer are appropriate and permissible. The previous authorization of the assumption of the Mine Operating Agreements was conditioned upon the closing of the transaction with Bear Canyon in order that the cure payments, if any, could be made by the Debtor from the purchase price paid by Bear Canyon. There is no material difference in the current circumstances that would warrant a different finding on the Assumption Motion at this

time.  As such, assumption of the Mine Operating Agreements is appropriate for the reasons and those set forth in the additional findings below.

### Cure of Monetary Defaults under Mine Operating Agreements

27.    Pursuant to prior orders of this Court, the Court has determined the amounts necessary and methods to cure the monetary defaults under the Mine Operating Agreements.  In its December 10, 2009 *Order and Judgment on Trustee's Objection to C.O.P Coal Development Company's Proof of Claim No. 9, Proof of Cure Claim No. 26 and Trustee's First, Third and Fourth Claims for Relief Against C.O.P. Coal Development Company in Adversary Proceeding #09-2248* (Dkt No. 1057), this Court allowed COP's cure claim in the amount of $1,320,930.89 subject to any setoffs permitted by later orders of the Court.  In its December 10, 2009 *Amended Order and Judgment on Trustee's Objection to ANR, Inc's Proof of Claim No. 27 and Trustee's Second Claim for Relief Against ANR, Inc. in Adversary Proceeding #09-2248* (Dkt No. 1060), the Court disallowed ANR's cure claim in its entirety, and there exists no monetary default under the ANR Mine Operating Agreement.

28.    The Purchase Price to be paid to the Trustee at Closing is more than sufficient to provide an escrow to assure payment of COP's cure claim as previously ordered.  Thus, the cure of past monetary defaults under the COP Mine Operating Agreement will be promptly effected at and through the Closing and such escrow. The Trustee may offset amounts owed COP to cure as the Court has previously ruled.

29.    With respect to offsets, the Court has ruled as follows:

> On that portion of the Trustee's Sixth Claim for Relief in Adversary Proceeding 09-02248, requesting an offset against any amounts owed to COP as a cure required by 11 U.S.C. § 365, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

> COP remains in willful violation of the automatic stay and in
> contempt of orders of this Court as explained in the Court's
> Findings and Conclusions, which have caused damages to this
> estate, including but not limited to, any amounts paid or payable by
> this estate to MMS for delinquent royalties (based on coal mined
> while the mine has been in the possession of Hiawatha), and the
> same may be offset against COP's cure claim in connection with
> any assignment, by the Trustee of COP's Coal Operating
> Agreement with the Debtor to a purchaser of the estate's mine
> operating rights.   Additional damages may be awarded to the
> Trustee and this estate against COP, Standard, Hiawatha and others
> as previously stipulated by the parties ( . . . ) as further proceedings
> in Adversary Proceeding No. 09-02375 warrant.

See Dkt No. 1158 at p. 5.

### Adequate Assurance of Future Performance

30.      There is no current default under paragraph 5 of the Mine Operating Agreements.

31.      The issues before the Court is whether there is adequate assurance that Buyer can "comply with all applicable Federal, State and local laws that apply to Operator's mining operation and… conduct its mining operations and take all actions and perform all duties required to maintain the Federal and State mining permits and approvals relating to the Premises."

32.      As part of its Findings of Fact and Conclusions of law on the Sale Motion, the Court specifically adopts and incorporates herein the Court's findings of fact and conclusions of law contained in paragraphs 1-20 of the Findings of Fact and Conclusions of Law Arising From the Trial on November 16, 17, 23 and 24, 2009 (Dkt No. 1053).

33.      As part of its Findings of Fact and Conclusions of law on the Sale Motion the Court specifically adopts and incorporates herein the Court's findings of fact and conclusions of

law contained in paragraphs 59-66 of the Findings of Fact and Conclusions of Law Arising From the Trial on December 10, 2009 and January, 12, 14 and 19, 2010 (Dkt No. 1156).

34.     COP and ANR have not presented a coherent alternative to the BLM standard with respect to "continued operation" or "maximum economic recovery".

35.     Although the Mine Operating Agreements use the term "diligently and continuously operate" the term is not defined by the Mine Operating Agreements in terms of annual production of coal or in terms of dollars generated.

36.     Although the Mine Operating Agreements use the term "ultimate maximum economic recovery" the term is not defined by the Mine Operating Agreements in terms of annual production of coal or in terms of dollars generated.

37.     COP's and ANR's monetary benefits are covered by the royalties section of the Mine Operating Agreements.  The purpose of paragraph 5 of the Mine Operating Agreements is to ensure that the "Operator… in the operation and development of the premises, comply with all applicable Federal, State and local laws that apply to Operator's mining operation and… conduct its mining operations and take all actions and perform all duties required to maintain the Federal and State mining permits and approvals relating to the Premises."

38.     Charles Reynolds testified that, in his opinion, there are numerous safety and mining violations on the premises.  There was no evidence or testimony that the coal leases, any permits or approvals relating to the premises have not been maintained.

39.     COP argues that the contents of a Resource Recovery and Protection Plan ("**R2P2**") submitted by the Debtor to the BLM in 2006 (the "**2006 R2P2**") and subsequently approved by the BLM amount in substance to an amendment of the COP Mine Operating

Agreement or otherwise somehow have become unalterable obligations of the Operator under that agreement.  In particular, COP contends that the 2006 R2P2 requires the "maximum economic recovery" ("**MER**") from the entire LMU to be realized within a time limit of 40 years from April 1990, when the original version of the LMU Application was filed. COP further contends that Buyer's decision not to use longwall mining equipment to extract coal from the Tank Seam renders it impossible for Buyer to mine out the entire reserves within the LMU within the remaining part of the 40-year mine-out period.

40.     Charles Reynolds testified that Rhino's production schedule does not comply with the approved R2P2 or the approved logical mining unit ("**LMU**") and Rhino's coal production will not meet the continued operation requirement of the BLM and Rhino therefore can not perform under the Mine Operating Agreements.

41.     The stipulations imposed by the BLM and accepted by the Trustee in connection with the LMU Decision (Exh. TR 607 and 610) require in part that "Prior to commencement of mining on the Bear Canyon LMU, an update to the [2006] R2P2 shall be required" ("**Buyer's R2P2**").  Such R2P2 plans are routinely amended to adapt to changing conditions encountered during mining, and such amendments are routinely approved by the BLM.  Neither COP nor ANR has any veto power or other right of control as to the contents or approval of such plans.

42.      The BLM can grant extensions to the 40 year life-of-mine mine-out requirements. Charles Reynolds testified that it is common for amendments to an R2P2 or an LMU to be approved by the BLM.  He also testified that compliance with the BLM continued operation clauses can be accomplished in a number of ways including meeting the 1% of recoverable

reserves test, applying for, and obtaining a waiver from the BLM and through payment of advance royalty payments in lieu of production.

43.     The uncontested evidence is that the BLM determines whether an operator is in compliance with the "continued operation" and "maximum economic recovery" requirements contained in the Code of Federal Regulations and that this Court has no jurisdiction over the BLM's decisions on that matter.

44.     The BLM and other Federal, State and local agency responsible for enforcing mining regulations have the jurisdiction to interpret their regulations and requirements and compliance with the same.  It is inappropriate for this Court to speculate with respect to future actions of these agencies or to enter an order that may be inconsistent with or infringe on the jurisdiction of these agencies.

45.     So long as Buyer mines in substantial compliance with an R2P2 as approved by the BLM and substantially complies with applicable Federal, State and local laws the Buyer is not in default under paragraph 5 of the Mine Operating Agreements.

46.     Buyer is an experienced coal producer with operations in Colorado, Kentucky, West Virginia, and Ohio and produced approximately 5 million tons of coal in 2009.  Included in Buyer's operations is the McClane Canyon Mine near Grand Junction, Colorado.  Buyer had revenues in excess of $415 million in 2009 and EBITDA of $61.9 million in 2009 (Exh. TR 600).

47.     The acquisition of the mine by Buyer for the price of $15,000,000.00 cash evidences a significant economic stake that will only be recovered through the diligent and

continuous operation of the mine in a manner that will realize the ultimate maximum economic recovery on the investment.

48.     Buyer produced evidence of its experience and expertise and ability to comply with federal and state mining and safety regulations.

49.     Based on the foregoing, the Trustee has demonstrated adequate assurance of Buyer's future performance under the Mine Operating Agreements and Buyer's ability and motivation to "comply with all applicable Federal, State and local laws that apply to Operator's mining operation and… conduct its mining operations and take all actions and perform all duties required to maintain the Federal and State mining permits and approvals relating to the Premises," including the BLM continuous mining requirements and to avoid forfeiture of any BLM lease.

50.      Based on the foregoing, the Trustee has demonstrated adequate assurance of future performance by Buyer with respect to the Mine Operating Agreements within the meaning of § 365(b)(1)(C) of the Bankruptcy Code.

51.     In addition, to provide additional assurance that the BLM's "continued operation" requirement may be satisfied if coal production prior to the Closing prove to be inadequate, the Court will require the Trustee to hold, in reserve, funds in an amount sufficient to cover advance royalty payments for COY09 and COY10 until such time as the Trustee can demonstrate that the reserves are no longer necessary to comply with the BLM's "continued operation" requirement for those years.

52.     The Trustee has met the requirements necessary to assume the Mine Operating Agreements pursuant to 11 U.S.C. § 365(a)-(b) and simultaneously assign them to Buyer in accordance with the terms of the Sale Agreement pursuant to 11 U.S.C. § 365(f)(2).

53.     The Mine Operating Agreements are assignable notwithstanding any provision contained therein to the contrary pursuant to § 365(f) of the Bankruptcy Code.  The assumption and assignment of the Mine Operating Agreements are integral to the Sale Agreement, are in the best interests of the Estate, and represent the exercise of sound and prudent business judgment by the Trustee.

**Issues Raised by ANR Concerning Hiawatha's Mining Permit and Reclamation Duties**

54.     Hiawatha holds a mining permit (the "**Hiawatha Permit**") issued by DOGM (Exh. ANR 13) affecting both the ANR Real Property and a more extensive area of other real property owned or leased by ANR in which the Estate has no interest.

55.     The Debtor has never conducted underground mining operations or other activities on the ANR Real Property which require a permit and has no mining permit in force with respect to such property.  The Debtor's operations with respect to the ANR Real Property to date have been done in conjunction with the LMU Application to include the ANR Real Property in a logical mining unit with the COP Real Property.  All of this has been consistent with the parties' agreements and expectations as previously found by the Court.

56.     The Hiawatha Permit is not property of the Estate, and the Debtor has no duty to perform any requirement imposed on Hiawatha by DOGM with respect to the Hiawatha Permit.

57.     There is no evidence before the Court that the maintenance or preservation of the Hiawatha Permit would be of any value or benefit to the Estate or to Buyer.

58. There is no evidence that the operation of the ANR Real Property by Buyer or the conducting of Buyer's mining operations will require the maintenance or preservation of the Hiawatha Permit or have any effect on such permit.

59. Any reclamation obligations that Hiawatha may have incurred by obtaining a DOGM permit affecting the ANR Real Property or that otherwise result from the actions of ANR and/or Hiawatha do not result from any act of the Debtor and are the obligations of Hiawatha or ANR and not the Debtor.

60. ANR has demonstrated no standing on its part to complain of reclamation burdens that may fall on Hiawatha. ANR has failed to demonstrate that it has any liability for reclamation work on the ANR Real Property.

61. The Court finds that, to the extent that any reclamation obligations may be imposed on the Debtor or its Estate with respect to the ANR Real Property as a result of Hiawatha's failure to perform its duties under the DOGM Hiawatha Permit, such obligations do not arise under the ANR Mine Operating Agreement.

62. There is nothing in the ANR Mine Operating Agreement that requires the Operator thereunder to post a bond for reclamation work that may be required at some future time on the ANR Real Property as a result of prior mining activities by U.S. Fuels.

71. No permit is required of the Operator with respect to the ANR Real Property under the ANR Mine Operating Agreement until mining activity is to be commenced on such property.

72. Neither the Trustee nor Buyer is required, as part of the assumption and assignment of or as future performance under the ANR Mine Operating Agreement, to perform

any reclamation duties arising from prior mining activities by U.S. Fuels or to compensate ANR or Hiawatha for the cost of any such reclamation work.

**Issues Raised by ANR Regarding the Exclusion of 60 Acres from the LMU**

73.     ANR's federal coal lease no. USL-025431includes 60 acres (the "**60-Acre Parcel**") that are not contiguous with any other lands as to which ANR holds any coal rights being leased (or sub-leased) to the Debtor under the ANR Mine Operating Agreement or otherwise (Exh. TR 605).

74.     In the ANR Mine Operating Agreement, ANR purported to grant to the Debtor the right to mine coal from a parcel of land marked with pink crosshatching in Exh. TR 605 (the "**Bridge Parcel**").  If ANR had owned coal rights for the Bridge Parcel, the 60-Acre Parcel would have been contiguous with the remainder of the LMU.  In fact, ANR had only surface rights to the Bridge Parcel.

75.     The BLM regulations governing logical mining units require that all property included within a logical mining unit be contiguous and under the control of a single operator.

76.     Charles Reynolds testified that if he had realized that the 60-Acre Parcel was not contiguous with the remainder of the LMU area, he would not have included it in the LMU Application.  He further acknowledged that the LMU Application was required to comply with federal law and that the BLM had the right to exclude the 60-Acre Parcel.

77.     The ANR Mine Operating Agreement contains no reference to an LMU and does not state any specific requirements with respect to an LMU.

78.     In seeking the BLM's approval of the Debtor's LMU Application, the Trustee (through no fault of his or the Debtor's) could not satisfy the contiguity requirement with respect

to the 60-Acre Parcel and, at the BLM's direction, excluded it from the final amendment to the

LMU Application.  Failure to obtain approval of the LMU would have exposed all of the Federal

Coal Leases of ANR on lands included in the LMU, as well as some of COP's Federal Coal

Leases, to forfeiture based on lack of production.

79.     ANR is estopped to claim that the Trustee has defaulted by complying with

federal regulations requiring exclusion of the 60-Acre Parcel from the LMU in order to achieve

the important objective of obtaining approval of the LMU, thereby mitigating the Trustee's

damages caused by ANR's misrepresentation and preserving the remaining Federal Coal Leases

covered by the ANR Mine Operating Agreement.

80.     The Trustee's compliance with BLM regulations governing logical mining units

does not constitute a breach or default of the ANR Mine Operating Agreement.

81.     Although ANR contends that it could have leased to the Trustee other coal lands

that could then be included in the LMU and thereby make the 60-Acre Parcel contiguous, the

Trustee has no rights to such other lands, and ANR has not made any offer to the Trustee to

amend the ANR Mine Operating Agreement to include such lands.

82.     The Trustee's counsel represented to the Court that, if ANR would amend the

ANR Mine Operating Agreement to include additional coal reserves that would make the 60-

Acre Parcel contiguous with the remainder of the LMU, the Trustee would accept that

amendment.  It may have been within ANR's power to make the 60-Acre Parcel contiguous, but

it was not within the Trustee's power to do so.

83.     No coal reserves within the 60-Acre Parcel were shown to exist in the 2006 R2P2, nor has ANR provided credible evidence that minable reserves exist thereon in commercial quantities.

**Hiawatha's Claims to Own 550(e) Improvements**

88.     In its Memorandum Decision Denying Hiawatha Coal Company, Inc.'s Motion for Partial Summary Judgment, Granting the Chapter 7 Trustee's Cross-Motion for Summary Judgment, and Striking the Trial Dates of May 27 and 28, 2009 (Dkt No. 51 - Adv. Proc. 08-02338), entered on May 8, 2009, the Court determined that Hiawatha Coal Company, Inc. ("**Hiawatha**") failed to adequately raise a genuine issue of material fact regarding its claim that it gave value to the Debtor for the assets (the "**549 Assets**") transferred to Hiawatha in connection with the June 24, 2008 Purchase and Sale Agreement between the Debtor and Hiawatha and therefore granted the Trustee's Motion for Partial Summary Judgment avoiding the transfer of the 549 Assets pursuant to 11 U.S.C. § 549.

89.     In the same adversary proceeding the Court entered its Order and Judgment Arising from Trial on November 16, 17, 23 and 24, 2009 (Dkt No. 139 of Adv. Proc. 08-02338) wherein the Court dismissed Hiawatha Coal Company, Inc.'s Counterclaim seeking an improver's lien under 11 U.S.C. § 550(e) on the grounds that Hiawatha is not a "good faith" transferee or improver of the 549 Assets and is not entitled to a lien encumbering assets improved, repaired, changed, replaced or added to during Hiawatha's possession of the mine.

90.     The Court has also ruled that where improvements, additions, replacements and repairs to assets originally obtained by Hiawatha from the Debtor are at issue, all such

improvements, additions, replacements and repairs belonged to the Estate free and clear of any

encumbrance or ownership of (Dkt No. 1188 in the main case).[5]

91.     Hiawatha has objected to the Sale Motion and asserts that those specific items of

personal property identified in Hiawatha's Exh. H-23 ("Disputed Assets"), are assets purchased

by Hiawatha after it acquired possession of the mine from the Debtor on or about June 24, 2008

and are not "improvements" to the Debtor's property but are owned by Hiawatha.

92.     Hiawatha's assertion of ownership of the improvements was previously addressed

by the Court in the trial and evidentiary hearing concluding in January 2010 (Dkt No. 152 – Adv.

Proc. 08-02338) wherein the Court clarified that all "improvements" were property of the Estate

and sellable by the Trustee  as follows:

> "ORDERED, that the Trustee's §550(a) claim is GRANTED for recovery of the
> transferred property rather than its value. The recovered property shall be turned
> over promptly and without damage beyond normal wear and tear and shall consist
> of all assets of any kind transferred pursuant to the Hiawatha Purchase
> Agreement, including any transfers of mere possession.  Such assets include every
> item constituting an "improvement" made thereto within the meaning of 11
> U.S.C. §550(e)(2), all of which are property of the Debtor's estate. The Trustee
> may sell all of the estate's right, title and interest in such assets including those
> improvements.  The Court makes no determination at this time as to what specific
> items of equipment constitute improvements or as to ownership of specific items
> of equipment allegedly owned by Hiawatha to the extent they do not constitute
> improvements. With respect thereto, the Court ORDERS the parties to cooperate
> in good faith to resolve such ownership issues."

---

[5] "Such assets include every item constituting an "improvement" made thereto within the
meaning of 11 U.S.C. § 550(e)(2), all of which are property of the Debtor's estate. The Trustee
may sell all of the estate's right, title, and interest in such assets including those improvements.
The Court makes no determination at this time as to what specific items of equipment constitute
improvements or as to ownership of specific items of equipment allegedly owned by Hiawatha to
the extent they do not constitute improvements. With respect thereto, the Court ORDERS the
parties to cooperate in good faith to resolve such ownership issues."  (Dkt No. 1158)

93.     The parties did negotiate as ordered, but were unable to come to agreement on the ownership of all assets identified by Hiawatha as being claimed by it.  The Trustee therefore asks this Court, in connection with the present Sale Motion, to determine which of the assets identified by Hiawatha are property of the Estate and which were not. Hiawatha objects to the Court doing so on procedural grounds, but nevertheless presented its evidence and arguments on the merits of its ownership claims at the evidentiary hearings conducted with respect to the present sale motion.

94.     The Court is excluding the following assets from the Disputed Assets because Trustee has stipulated that the following assets set forth on Exh. H-23 are not property of the Debtor or the Estate and the Trustee is not proposing to sell these assets:

    3 Mine rescue chambers (partially purchased)
    46 cap lamps purchased by Hiawatha
    1 HP Plotter
    7 computers purchased by Hiawatha (5 on the excluded list)
    Truck 106 (excluded)
    Truck 107 (excluded)
    Truck 115 (excluded)
    Truck 5 – Isuzu gas truck (excluded)
    IR Air Compressor (excluded)
    Longwall Cans
    3 pallets cap pieces
    4 pallets crib blocks
    Box check frames
    2 pallets crib blocks
    Longwall cables (belongs to A-Fab)
    Winch Controller (belongs to A-Fab)
    Eimco 936 Bucket (belongs to A-Fab)
    Longwall hose trailer (belongs to A-Fab)
    Fuel Tank by 3 mine (belongs to Haycock)
    89 Truck (owned by Mark Reynolds)
    90 Truck (owned by Luke Brown)
    Pneumatic Trailers (owned by Altco Trucking)
    Chairs purchased by Charles Reynolds

95.     Procedurally, Hiawatha asserts, based on Bankruptcy Rule 7001, that the Court may only interpret and apply its prior order to the facts of this case if the Trustee files another adversary proceeding asking the Court to determine ownership of the Disputed Assets.

96.     Section 363 does not require an adversary proceeding be filed in connection with a proposed sale of property of a bankruptcy estate.  The Trustee may only sell property of the bankruptcy estate and if there is a bona fide dispute as to ownership an adversary proceeding may be required.  However, if there is not a bona fide dispute as to ownership of estate property, an objecting party should not be permitted to thwart a proposed sale by asserting ownership of property proposed to be sold.

97.     Having now taken additional evidence  regarding the specific nature of the assets in dispute, and incorporating the evidence already taken during the previous days of trial in adversary proceeding 08-02338, it is apparent that Hiawatha's assertions of ownership of the particular assets at issue does not raise a bona fide dispute and cannot be sustained for several reasons.

98.     Hiawatha has consistently maintained that virtually all of the assets at issue are "improvements."  In Hiawatha Coal Company, Inc.'s Memorandum in Opposition to Trustee's Motion for Order Authorizing Sale of Mine Assets and Assignment of Executory Contracts under §§ 363 and 365 and in Opposition to Trustee's §547 Takeover Claim and Trustee's §550(a) Claim (Dkt No. 1045) at 27-28, Hiawatha stated the following:

> 4.     As a practical matter, much of the mining equipment is difficult, if not impossible, to recover from the mine.  For example, the continuous belt system, by which the coal is removed from the mine, is worn, old and undersized for mining under the longwall system, and its removal will cost more than its value. Furthermore, the system itself is a fixture in that it is permanently attached into the rock face of the mine.

Additionally, Hiawatha has made reasonable and necessary alterations and repairs to elements of the mining system in the form of additions which have rendered the system so inextricably interconnected and integrated that the additions cannot be removed or retrieved without rendering the elements unworkable.  As an example, virtually all internal parts of the belt drive system have been replaced.

99.     It is Hiawatha's burden to show that the assets it claims to own are not "improvements."   In fact the evidence produced by Hiawatha established that most of the Disputed Assets were improvements to the Debtor's property.

100.     The evidence at trial showed that most of the Disputed Assets in question were physically located on the mine site, incorporated into various pieces of equipment, or attached to the ground in various ways.

101.     Mr. Reynolds testified, for example, that the coal load-out and sampling buildings were "upgrades" to assets previously used in the Debtor's operations and were affixed to the ground in concrete footings, that the new coal crusher attached to the tipple was welded thereto and was attached to the tipple for the purpose of improving the tipples capacity.

102.     The definition of "improvements" under §550(e) is not bounded or limited by state law defining accessions.  Rather, 550(e) has its own definition of "improvements" which leaves to the trial court considerable discretion as to what is "included" within the definition. In most cases, this broad definition of "improvements" will inure to the benefit of entities who find themselves liable to return to the estate property previously acquired from the Debtor.   An "accession" under state law would also be an "improvement" under §550(e), but the reverse is not true.  There is no requirement under 550(e) that "physical changes" or "additions" to the property be of an irreversible nature in order to be considered "improvements."

103.    Even if §550(e) were not applicable in this case, the majority of Disputed Assets are, nevertheless, property of the Estate.  Hiawatha has not argued, and has not cited any legal authority for, the proposition that ownership of an asset is transferred or changed as a result of an "improvement" to or "repair" of the asset.

104.    There was no evidence produced by Hiawatha to establish that removal of the Disputed Assets would not have a negative impact on the mine operation or make the mine inoperable.  Most of the Disputed Assets are more than "accessions" to the Debtor's property and Hiawatha's evidence failed to establish that, other than set forth below, the Disputed Assets are owned by Hiawatha.

105.    With respect to inventory, the testimony of Charles Reynolds and the other undisputed evidence established the following:

    i.    Hiawatha received $1,922,000 of inventory from the Debtor.

    ii.    Hiawatha used the inventory it received from the Debtor in Hiawatha's operation of the mine.

    iii.    During the operation of the mine Hiawatha purchased inventory in the amount of $491,940.91

    iv.    Hiawatha used more than $491,940.91 of inventory in its operation of the mine

106.    Reynolds admitted that the specific items of inventory listed in Hiawatha's inventory list (Exh. H-24) are essentially the same kinds of materials, tools, parts and equipment that were received from the Debtor.

107.    Hiawatha's position is that, notwithstanding the fact that it used inventory during its operation of the mine, it did not use any inventory that it purchased.  The unstated conclusion is that Hiawatha consumed the Debtor's inventory during Hiawatha's operation of the mine.

108.    Hiawatha is using the "first in-first out" ("FIFO") method of tracing the inventory it claims to own.

109.    Hiawatha failed to produce any evidence, that it used less inventory than it purchased while operating the mine.  It is apparent that the Trustee has recovered and is selling to Rhino only a fraction of the inventory that was originally transferred to Hiawatha by the Debtor.  The Court determines that the "last in-first out" ("LIFO") method is the appropriate accounting method to apply in this case.

110.    Based on the foregoing, the following Disputed Assets are found to be property of the Estate and not property of Hiawatha:

Pile 4&1 Loadout belt housing/structures
Pile 4&1 Loadout belt scales
Pile 4&1 Loadout Belt Drive, Motor & Gearbox
Coal Sampler splitting System
Belt 1 upgrade including Gearboxes and lagging on drums
Belt 2 upgrade including Gearboxes and lagging on drums
Belt 3, upgrade including Gearboxes and motors replaced
Belt 4 upgrade including Fabric
Belt 4 Gearboxes and lagging on drums
Secondary Crusher
Tipple Control Room Door
Upper Crossover Belt Fabric
Dust Belt Drive
South Tower Belts gearboxes and motors
Air Compressor on Loadout
Tank for Air Compressor (53 North)
Richwood Air Wiper
Belt Structure hardware
Continental Controller
North Main Belt Drive & Wiper
Rebuilt Drive
13 hp Water Pump
1.5 hp Water Pump & controller
4 Left Belt Structure
4 left Belt Fabric
4 Left Water Line

> Omega Blocks – 4 Overcasts
> Rebuilt Controller
> Parts and Supplies Inventory (Warehouse and Shop)
> Tipple Welders
> Desks (4)
> Truck sensor system
> Coal Sampling Room Heater
> Rock Dust Air Compressor
> Pile 4&1 Loadout Sweep Sampler
> 4 mine fan motors and controllers
> New Roll Leaky Feeder Cable

111.     The Court determines that the foregoing Disputed Assets are "improvements," "additions," "changes" or "repairs" to the Mine Assets acquired by Hiawatha from the Debtor which have been ordered returned to the Estate pursuant to §§ 549 and 550 of the Bankruptcy Code and are property of the Estate.

112.     Based on the foregoing, the following Disputed Assets are found to be property of Hiawatha and are not property of the Estate:

> 13 Ocenco self rescuers purchased by Hiawatha
> 84 CSE self rescuers purchased by Hiawatha
> 12 Kenwood Radios 46 cap lamps purchased by Hiawatha.

## Removal Of Equipment Left At Or In The Mine

113.     At present there is in the mine a massive longwall system comprised of the items of equipment described in footnote 1 to the form of Order attached to the Sale Agreement.  The longwall system might be an asset that the Trustee may recover pursuant to §§ 547 or 548 of the Bankruptcy Code from A-FAB Engineering, which claims to own the longwall system and to have leased the longwall system to the Debtor in late 2007 (a few weeks before the Involuntary Petition date) pursuant to a sale and lease back arrangement with the Debtor.

114.     The longwall system will be expensive to remove from the mine, but must be removed in order to continue mining operations, since it partially blocks the mine corridors.

115.     The value of the longwall system is in doubt given its age and history, and the Trustee has not yet determined whether to seek recovery of the longwall system pursuant to the Trustee's avoiding powers.

116.     Until the longwall system is recovered by the Trustee, if ever, those claiming the right to immediately possess the longwall system should be responsible to remove it from the mine at their own expense.

117.     If the longwall system is left within the mine or on the mine premises for longer than 90 days after the sale of the Mine Assets closes, the Trustee should be allowed to remove the equipment.

118.     The Trustee should be granted a lien for the cost of removing the longwall system and may retain the equipment for the benefit of this Estate until such lien is satisfied by payment or foreclosure.

119.     Removal of any other equipment, in addition to the longwall system, which this Court determines pursuant to this Sale Motion to belong to A-Fab or Hiawatha and not this Estate, should be dealt with in the same way and under the same terms as the longwall system.

## II.     CONCLUSIONS OF LAW

1)  All of the Mine Assets are owned by the Debtor except for the following:

> 3 Mine rescue chambers (partially purchased)
> 46 cap lamps purchased by Hiawatha
> 1 HP Plotter
> 7 computers purchased by Hiawatha (5 on the excluded list)
> Truck 106 (excluded)
> Truck 107 (excluded)

Truck 115 (excluded)
Truck 5 – Isuzu gas truck (excluded)
IR Air Compressor (excluded)
Longwall Cans
3 pallets cap pieces
4 pallets crib blocks
Box check frames
2 pallets crib blocks
Longwall cables (belongs to A-Fab)
Winch Controller (belongs to A-Fab)
Eimco 936 Bucket (belongs to A-Fab)
Longwall hose trailer (belongs to A-Fab)
Fuel Tank by 3 mine (belongs to Haycock)
89 Truck (owned by Mark Reynolds)
90 Truck (owned by Luke Brown)
Pneumatic Trailers (owned by Altco Trucking)
Chairs purchased by Charles Reynolds
13 Ocenco self rescuers purchased by Hiawatha
84 CSE self rescuers purchased by Hiawatha
12 Kenwood Radios 46 cap lamps purchased by Hiawatha.

2)   There is no bona fide dispute as to the Estate's ownership of the Mine Assets and § 363 does not require an adversary proceeding be filed in connection with a proposed sale of property of a bankruptcy estate.

3)   Except as may otherwise be provided in the Order, the Trustee may sell the Mine Assets free and clear of the Encumbrances because, in each case, one or more of the standards set forth in § 363(f) of the Bankruptcy Code has been satisfied.

4)   All holders of Encumbrances who have come forward at the hearings shall have their Encumbrances attach to the net proceeds of the sale of the Mine Assets received by the Trustee in the order of their priority, with the same validity, force and effect which they now have as against the Mine Assets and subject to any offsets, claims and defenses the Trustee or other parties may possess with respect thereto.

5)  Holders of Encumbrances who did not object to the sale of the Sale Motion are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code.

6)  With respect to Holders of Encumbrances that are not in bona fide dispute and who objected to the Sale motion, because the sale proceeds exceeds the aggregate value of Encumbrances that are not in bone fide dispute, their claims are adequately protected because, under § 363(f)(3), their Encumbrances attach to the proceeds of the sale of the Mine Assets.

7)  With respect to Holders of Encumbrances that are in bona fide dispute and who objected to the Sale Motion, the Sale Motion is authorized under § 363(f)(4).

8)  The following Encumbrances are in bona fide dispute for purposes of 11 U.S.C. § 363(f)(4):

a)  The interest of P.P.M.C., Inc. ("**PPMC**") as to attorneys' fees under such security interests in favor of the Bank of Utah that are now held by PPMC on the "**Bank of Utah Equipment**" shown in Exh. E-1 to the form of Order attached to the Sale Agreement;

b)  The interest of Emery County, Utah ("**Emery County**") as to 2009 property taxes for the following parcel:

| Parcel No. | Amount | Nominal "Owner" |
|------------|--------|-----------------|
| 09-0300-0410 | $443,447.31 | Hiawatha Coal Co-Bear Canyon |

c)  The interests of ABM, Inc. ("**ABM**"), Fidelity Funding Company ("**Fidelity Funding**"), Security Funding, Inc. ("**Security Funding**"), Standard Industries, Inc. ("**Standard**") and World Enterprises ("**World**") that are purportedly perfected by the following financing

statements (the "**2007 Financing Statements**"):

| Date | Filing No. | Secured Party(ies) |
|------|-----------|--------------------|
| 05/18/2007 | 320212200769 | Security Funding, ABM, World |
| 08/17/2007 | 326395200701 | Security Funding, ABM, World |
| 10/31/2007 | 331350200794 | World, ABM, Security Funding, Fidelity Funding |
| 11/21/2007 | 332771200704 | ABM |
| 11/21/2007 | 332773200700 | Standard |
| 11/21/2007 | 332766200704 | Fidelity Funding |
| 11/21/2007 | 332772200707 | Security Funding |
| 11/21/2007 | 332770200701 | World |

d)  The interests claimed by Security Funding, Standard, World and Fidelity Funding and evidenced by the following real property security interests that encumber all or part of the COP Real Property or the ANR Real Property:

i)  Real Property Security Agreement dated November 14, 2007, signed by C. W. Mining Company and World Enterprises and recorded December 7, 2007 in the office of the Emery County, Utah Recorder as Entry No. 388434;

ii)  Real Property Security Agreement dated November 14, 2007, signed by C. W. Mining Company and Security Funding and recorded December 7, 2007 in the office of the Emery County, Utah Recorder as Entry No. 388435;

iii)  Real Property Security Agreement dated November 14, 2007, signed by C. W. Mining Company and Standard Industries, Inc. and recorded December 7, 2007 in the office of the Emery County, Utah Recorder as Entry No. 388435; and

iv) Real Property Security Agreement dated effective June 24, 2008, signed by Hiawatha

Coal Company, Inc. ("**Hiawatha**") and Fidelity Funding and recorded November 13,

2008 in the office of the Emery County, Utah Recorder as Entry No. 392523.

e)   Any interests of the secured parties shown in the table below under financing statements

("**Hiawatha Financing Statements**") naming Hiawatha as debtor as they relate to the

Mine Assets:

| Date | Filing No. | Secured Party(ies) |
|------|-----------|--------------------|
| 8/30/2008 | 350275200800 | Security Funding |
| 8/30/2008 | 350276200803 | ABM |
| 8/30/2008 | 350277200806 | World |
| 9/29/2008 | 351750200805 | Fidelity Funding |
| 9/29/2008 | 351776200803 | A-Fab |
| 11/10/2008 | 354044200806 | John Deere |
| 1/6/2009 | 356698200904 | Bank of Utah (and/or PPMC as assignee) |
| 10/12/2009 | 370283200938 | N.W.R. Limited Partnership |
| 10/12/2009 | 370284200939 | Standard |
| 10/30/2009 | 371136200941 | M.B.S.C. LLC |
| 10/30/2009 | 371144200941 | ABM |
| 10/30/2009 | 371145200942 | World |
| 10/30/2009 | 371146200943 | World |
| 10/30/2009 | 371147200944 | N.W.R. Limited Partnership |

f)   Any lessor's lien claimed under Utah Code Annotated §38-3-1, et seq. that is claimed for

rents due prior to the Closing date either by COP under the COP Mine Operating

Agreement or by ANR under the ANR Mine Operating Agreement.

9)  At the present time, there exists no default under the Continuous Operations Clause.

10) After Closing, Buyer shall not be in default under the Continuous Operations Clause so long as Buyer substantially complies with all applicable Federal, State and local laws that apply to the operation of the Mine and maintains the Federal Coal Leases.

11) The BLM and other Federal, State and local agency responsible for enforcing mining regulations have the jurisdiction to interpret their regulations and requirements and compliance with the same.  It is inappropriate for this Court to speculate with respect to future actions of these agencies or to enter an order that may be inconsistent with or infringe on the jurisdiction of these agencies.

12) The Trustee has demonstrated adequate assurance of Buyer's future performance under the Mine Operating Agreements and Buyer's ability and motivation to "comply with all applicable Federal, State and local laws that apply to Operator's mining operation and… conduct its mining operations and take all actions and perform all duties required to maintain the Federal and State mining permits and approvals relating to the Premises," including the BLM continued operation requirements and to avoid forfeiture of Federal Coal Leases.

13) The Trustee has satisfied all requirements under §§ 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under the Mine Operating Agreements.

14) The Trustee has satisfied all requirements under §§ 365(b)(1) to cure or provide adequate assurance that he will promptly cure all monetary defaults under the COP Mine Operating Agreement.

15) No monetary or other default exists under the ANR Mine Operating Agreement.

16) Assumption of the Mine Operating Agreements and assignment thereof to the Buyer are appropriate and permissible.

17) The Trustee has met the requirements necessary to assume the Mine Operating Agreements pursuant to 11 U.S.C. § 365(a)-(b) and simultaneously assign them to Buyer in accordance with the terms of the Sale Agreement pursuant to 11 U.S.C. § 365(f)(2).

18) The Mine Operating Agreements are assignable notwithstanding any provision contained therein to the contrary pursuant to § 365(f) of the Bankruptcy Code.

19) The sale of the Mine Assets, the terms and conditions of the Sale Agreement (including all schedules and exhibits affixed thereto), and the transactions contemplated thereby, as modified by the Order, are authorized and approved in all respects.

20) Once assumed and assigned, the Mine Operating Agreements are deemed valid and binding and in full force and effect.

21) To the extent that any reclamation obligations may be imposed on the Debtor or its Estate with respect to the ANR Real Property as a result of Hiawatha's failure to perform its duties under the DOGM Hiawatha Permit, such obligations do not arise under the ANR Mine Operating Agreement.

22) Neither the Trustee nor Buyer is required, as part of the assumption and assignment of or as future performance under the ANR Mine Operating Agreement, to perform any reclamation duties arising from prior mining activities by U.S. Fuels or to compensate ANR or Hiawatha for the cost of any such reclamation work.

23) The Trustee's compliance with BLM regulations governing logical mining units, including the exclusion of the 60-Acre Parcel from the LMU, does not constitute a breach or default of the ANR Mine Operating Agreement.

24) The definition of "improvements" under §550(e) is not bounded or limited by state law defining accessions. Rather, 550(e) has its own definition of "improvements" which leaves to the trial court considerable discretion as to what is "included" within the definition. There is no requirement under 550(e) that "physical changes" or "additions" to the property be of an irreversible nature in order to be considered "improvements."

25) Objections made with respect to the sale of the Estate's right, title and interest in water rights, if any, appurtenant to the COP Real Property or the ANR Real Property have no merit inasmuch as the Court is making no determination as to the existence, scope or ownership of appurtenant water rights.

End of Document